NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

NICHOLIOS N., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, L.J., N.J., N.N., L.J., *Appellees*.

No. 1 CA-JV 17-0492
FILED 11-8-2018

Appeal from the Superior Court in Mohave County
No.   B8015JD201604036
The Honorable Rick A. Williams, Judge

**AFFIRMED**

COUNSEL

The Stavris Law Firm PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Cathleen E. Fuller
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

---

Judge Jon W. Thompson delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Lawrence F. Winthrop joined.

---

**T H O M P S O N**, Judge:

¶1        Nicholios N. (Father) appeals the juvenile court's order severing his parental rights to his four children based upon the statutory grounds of abuse and neglect under Arizona Revised Statutes (A.R.S.) section 8-533(B)(2), and nine months in an out-of-home placement under A.R.S. § 8-533(B)(8)(a).  He also argues that the state failed to prove by a preponderance of the evidence that severance was in the children's best interests.  For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2        Father and Octivia J. (Mother) are the natural parents of L.J., born in 2003; N.J., born in 2004; N.N., born in 2009; and L.Y.J., born in 2017. Mother did not contest the severance and is not a party to this appeal.[1]

¶3        In 2009, while the family lived in California, the Department of Children and Family Services (DCFS) received a report that Father had physically abused the children. Upon investigation, California DCFS confirmed that N.J. and N.N. both had significant marks indicative of physical abuse.  Police arrested Father for child abuse.  Over the next few years, the children remained in foster care while the parents participated in services.   In 2012, the children returned to the parents' home, and afterwards, the family moved to Arizona.

¶4        In September 2015, the Arizona Department of Child Safety (DCS or the Department) received a report that Father was again abusing the children.  The Department met with the parents, and they agreed to stop using physical discipline.  However, in April 2016, L.J. ran away from home because Father was still abusing the children.   In an ensuing investigation, L.J., N.J., and N.N. each disclosed ongoing physical abuse by Father.

---

[1] The court also terminated the rights of John Doe, an alleged father of L.J. and N.J.

Consequently, DCS took custody of the children and filed a dependency petition. The next month, the court adjudicated them dependent and set a case plan of family reunification, concurrent with severance and adoption.

**¶5** The Department provided the parents with several services, including psychological evaluations; a psychiatric evaluation (for Father); individual therapy; domestic-violence, anger-management, stress-management, and parenting classes; and visitation. Father participated in a few therapy sessions, group classes, and visits. In July 2016, he also participated in a psychological evaluation.[2] The psychologist noted that Father "lacks a certain level of willingness to change" but recommended mental-health monitoring, individual therapy, and family therapy "in the home setting." In October, the parents stopped engaging with DCS and refused to disclose their whereabouts.

**¶6** In February 2017, unbeknownst to DCS, Mother gave birth to L.Y.J. That April, the court changed the case plan to severance and adoption for the three older children. That same month, the Department confirmed L.Y.J.'s existence and filed a dependency petition for her. However, the parents still refused to provide DCS their address or contact information, so DCS could not assess L.Y.J.'s safety or assume custody of her. At a preliminary protective hearing, Mother initially denied L.Y.J.'s existence and then refused to answer questions about her, even after the court placed Mother under oath. Mother instead told the court that she had no address to give because she was homeless in Bullhead City. The court found Mother in contempt and she was arrested.

**¶7** Shortly thereafter, DCS moved to terminate the parents' rights to the three older children under the abuse and neglect and nine-month out-of-home placement grounds. Although Mother attended three purge hearings over April and May 2017, she provided little information about L.Y.J.'s existence or whereabouts and remained in contempt of court. In June, DCS took custody of L.Y.J. after an unidentified male left her at a church in Las Vegas. The court then found that Mother had purged her contempt finding. Around this same time, both parents were incarcerated for criminal charges relating to custodial interference.

**¶8** In July, DCS amended its termination petition to allege abuse and neglect as to L.Y.J. Two months later, the court held a severance

---

[2] Father's psychological evaluation was not admitted into evidence at the severance hearing, but DCS reported the psychologist's recommendations in its September 2016 court report.

hearing as to the three older children and a combined dependency / termination hearing as to L.Y.J. The court found L.Y.J. dependent, and terminated Father's parental rights to all four children on the grounds alleged. Father timely appealed. We have jurisdiction pursuant to the Arizona Constitution Article 6, Section 9; A.R.S. §§ 8-235(A), -12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

**¶9** A parent's right to custody and control of his own child, while fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248-49, ¶¶ 11-12 (2000). Severance of a parental relationship may be warranted where the state proves one statutory ground under A.R.S. § 8-533 by "clear and convincing evidence." *Id.* "Clear and convincing" means the grounds for termination are "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284-85, ¶ 25 (2005) (internal quotation omitted). Additionally, the court must also determine what is in the best interests of the child by a preponderance of the evidence. *Id.* at 284, ¶ 22.

**¶10** "[W]e will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002). We do not reweigh the evidence, but "look only to determine if there is evidence to sustain the court's ruling." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, this Court need not address claims pertaining to the other grounds. *Jesus M.*, 203 Ariz. at 280, ¶ 3.

### I. Statutory Grounds

**¶11** Father argues that insufficient evidence supports the severance order. We disagree because reasonable evidence supports the termination order for all four children under the abuse ground.

**¶12** Under A.R.S. § 8-533(B)(2), the superior court may terminate a parent's rights if "the parent has neglected or willfully abused a child." Abuse includes "serious physical or emotional injury" or "situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child." A.R.S. § 8-533(B)(2). If a parent abuses or neglects a child, the court may terminate that parent's rights to other children on this basis, even if there is no evidence that the other children

were abused. *Linda V. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 76, 79, ¶ 14 (App. 2005).

¶13 Here, the superior court found that "all three of the older children suffered abuse at the hands of both parents," but Father "was the primary actor who meted out this abuse." Reasonable evidence supports the court's finding.

¶14 In April 2016, although Father told DCS he would not use physical discipline anymore, L.J. ran away from home because he continued to do so. L.J. disclosed that Father beat the children with various items, "sometimes a belt, sometimes wires, sometimes hangers." Indeed, L.J. had an open wound on her back consistent with her disclosure of being hit with a laptop cord. L.J.'s siblings likewise had several scars and marks consistent with physical abuse. L.J. also disclosed that Father strangled N.J. and her, sometimes causing them to lose consciousness. She further stated that Father would punish her by locking her in her room for days at a time.

¶15 N.J. confirmed that on various occasions Father choked her; she described it as "being lifted up by her neck, pinned up against the wall and held there until she passed out unconscious." She also described "being pushed or thrown across the room on a couple of occasions" and "being hit with different objects." N.N. likewise reported being hit with various objects. He also stated that Father moved him into a carpeted closet before beating him with a belt so he would not bruise if he fell. The children never recanted their disclosures. Thus, reasonable evidence in the record supports the severance order under the abuse ground for L.J., N.J., and N.N.

¶16 In his Opening Brief, Father argues that, contrary to the children's statements, the evidence showed his "acceptance of responsibility[,] and [corresponding] behavioral changes" after his California DCFS case. However, the juvenile court had an opportunity to weigh the evidence that Father cites and to resolve any conflicts therein. *See* A.R.S. 8-533(B)(2) (requiring court to consider only whether a "parent has neglected or willfully abused a child"); *Jesus M.*, 203 Ariz. at 282, ¶ 12 (this Court does not reweigh the evidence on appeal).

¶17 The evidence reasonably supports a finding that due to Father's abuse of the three older children, there is a risk of abuse to L.Y.J. Father abused N.J. and N.N. at very young ages. When his California DCFS case began, the children were all under the age of six, and N.N. was less than one year old. Nevertheless, a hotel employee reported observing Father beating five-year-old N.J. with a belt, and when officers arrived she

"presented with several belt lash markings on the front and back of her body" and four-month-old N.N. appeared to have "a 'hand' shaped mark" and bruising and swelling on his left eye. N.N. also recalled a time, before he turned five years old, at which Father punched him in the stomach and locked him in his room for pulling drywall pieces off the wall. Father's willingness to physically abuse his young children places L.Y.J.'s health and safety at a direct risk of harm in his care because as an infant dependent on adults for all her needs, L.Y.J. is vulnerable to abuse.

¶17 Moreover, the risk of harm L.Y.J. faced did not subside after Father moved to Arizona. Even after successfully participating in services in California and after telling DCS that he would no longer use physical discipline, Father continued to abuse his three oldest children. During the current dependency, the case manager testified that DCS "was looking for the parents to address their own anger issues and coping skills, and how they would deal with [the children] if [parenting got] overwhelming and frustrating." But the parents never addressed these concerns. Father completed a psychological evaluation and participated in some therapy, group classes, and visits, but he failed to successfully complete most services. He never fully addressed his past abuse of the children through domestic-violence, anger-management, and stress-management classes. Father also never completed therapy or a psychiatric evaluation, even though his evaluating psychologist recommended mental-health monitoring. Furthermore, he never attended parenting classes or progressed to unsupervised visits with the children. Nine months before the severance hearing, Father refused to participate in any more services.

¶18 Additionally, after Mother's arrest for contempt, she testified that she last saw L.Y.J. in Father's custody. Yet, Father refused to cooperate with DCS's attempts to locate L.Y.J. for the first four months of her life, so DCS could not assess her safety. Indeed, the record suggests that after Father's arrest, L.Y.J. remained in the care of an unidentified male, and when DCS finally recovered her, she showed some signs of neglect. In sum, Father's history of abuse, disengagement with the case plan, and willingness to subject L.Y.J. to a risk of neglect shortly after her birth support a finding that she would be at risk for abuse in his care.

¶19 Father argues that DCS denied him family therapy, a service recommended in his psychological evaluation.[3] Even assuming DCS is

---

[3] Because Father's counsel adequately addressed this issue at the severance hearing, we decline the State's invitation to apply waiver. *Cf. Shawanee S.*

required to provide Father services under the abuse ground, which the State disputes, he fails to show how DCS denied him the time and opportunity to engage in appropriate reunification services. Regarding family therapy, Father's evaluating psychologist reported that he may benefit from it, but qualified this recommendation by also stating that it "should be best offered in the home setting, and will be imperative to a successful reunification." Similarly, the case manager testified that DCS "usually start[s] family therapy once everybody is engaged in services and we are moving forward towards . . . in-home services" and reunification.

**¶20** Accordingly, the case manager testified "that the parents needed to address the[ir] anger . . . issues before we could start family therapy." The Department therefore planned to implement that service when the children returned to Father's physical custody. However, Father's disengagement with a multitude of services and active disregard for the case plan prevented almost all of DCS's reunification efforts, including family therapy. On this record, we cannot say that DCS erred in not providing family therapy sooner in the case plan.

## II. Best Interests

**¶21** Father also argues that the superior court erred in finding that severance was in the best interest of the children. Severance is in a child's best interests if the child would benefit from severance or be harmed by continuation of the parent-child relationship. *In re Maricopa Cty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). Courts "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 146, ¶ 1 (2018).

**¶22** "In a best interests inquiry . . . we can presume that the interests of the parent and child diverge because the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence." *Kent K.*, 210 Ariz. at 286, ¶ 35; *see also In re Maricopa Cty. Juv. Action No. JS–6831*, 155 Ariz. 556, 559 (App. 1988) ("In most cases, the presence of a statutory ground will have a negative effect on the children[,]" which supports a best interests finding.). Once a juvenile court finds that a parent is unfit, the focus shifts to the child's interests. *Kent*

---

*v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶¶ 17-18 (App. 2014) (applying waiver when both before the termination hearing and "at the termination hearing, [the mother] did not argue that [DCS] failed to make reasonable efforts").

*K.*, 210 Ariz. at 285, ¶ 31. Thus, in considering best interests, the court must balance the unfit parent's "diluted" interest "against the independent and often adverse interests of the child in a safe and stable home life." *Id.* at 286 ¶ 35. Of foremost concern in that regard is "protect[ing] a child's interest in stability and security." *Id.* at ¶ 34.

**¶23** The superior court found that maintaining Father's parental rights when "he's shown no interest in addressing the . . . real[,] valid[,] and significant safety concerns raised by the state" would be detrimental to the children. Reasonable evidence supports this finding. The older children remained in DCS custody for almost a year and a half, and all four children remained at risk of future abuse in Father's care. Father's abuse had caused the older children to develop anger and frustration issues and they learned "unhealthy coping skills" from the past trauma. They required intensive support services to address these concerns. Two of the children required psychiatric hospitalization, and all three children had significant behavioral concerns. Additionally, "[t]here was a lot of anger and animosity between the children," to the extent they required family therapy during their sibling visits. Finally, when DCS recovered L.Y.J., she showed some signs of neglect.

**¶24** Upon this backdrop, the case manager testified that severance was in the children's best interests "[b]ecause the parents haven't made any changes that show that they would protect the children, keep the children safe, and in fact, the children would be at risk of substantial harm" if returned to the parents' care. The case manager testified that severance would protect the children from a future risk of abuse and allow them to progress towards permanency. This evidence is sufficient to support the court's best-interests finding.

**¶25** Despite this, Father argues that severance was not in the children's best interests because they "were in multiple placements, some of which were not adoptable placements." However, the court specifically considered this evidence in making its findings. *In re Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352 (App. 1994) (DCS "need not show that it has a specific adoption plan before terminating a parent's rights" if the children are adoptable). Here, consistent with the court's findings, other reasonable evidence showed that the children's placements were meeting their needs and that all the children remained adoptable despite their special needs. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 30 (App. 2010) (relevant factors in a best-interest determination include whether existing placement is meeting the child's needs, whether

the child is adoptable, and whether an adoptive placement is immediately available).

## CONCLUSION

**¶26** For the foregoing reasons, we affirm the juvenile court's order terminating Father's parental rights.



AMY M. WOOD • Clerk of the Court
FILED:   AA