NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MONICE C., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, B.H., SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY, *Appellees*.

No. 1 CA-JV 20-0401

FILED 05-13-2021

Appeal from the Superior Court in Maricopa County
No. JD532746
The Honorable Jeffrey A. Rueter, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate's Office, Mesa
By Suzanne Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Eric Devany
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Cynthia J. Bailey joined.

---

**W I N T H R O P**, Judge:

**¶1**        Monice C. ("Mother") appeals the termination of her parental rights to B.H. on the grounds of chronic substance abuse and six months' out-of-home placement.  *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(3), (8)(b). For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**[1]

**¶2**        Mother, who is now twenty-seven years' old, and Byron H. ("Father") are the biological parents of B.H., who was born in August 2017.[2] Mother is an enrolled member of the Osage Nation in Oklahoma.  Father and B.H. are enrolled members of the Salt River Pima-Maricopa Indian Community ("the Community").[3]

**¶3**        In April 2012, Mother tested positive for marijuana while pregnant with B.H.'s older half-brother, J.C.  In September 2015, during an assessment at the Community's Division of Behavioral Health Services, Mother admitted smoking marijuana once a month, binge drinking two to four times a month, and that she had used methamphetamine since the age of sixteen.  While pregnant with B.H. in 2017, Mother again used marijuana.

---

[1]      We view the evidence and reasonable inferences to be drawn therefrom in the light most favorable to affirming.  *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

[2]      Father's parental rights to B.H. were previously terminated, and he is not a party to this appeal.

[3]      This matter is subject to the Indian Child Welfare Act ("ICWA").  *See* 25 U.S.C. §§ 1901-1963.  The Community had notice of these proceedings and participated through counsel, and no argument is made challenging compliance with ICWA.

¶4   Mother relapsed on methamphetamine in March 2018, and her children were sent to live with her mother ("Grandmother"). In July 2018, Mother participated in another behavioral-health assessment, where she admitted to using methamphetamine and Percocet daily from March to May of that year and drinking alcohol almost daily. She was diagnosed with severe amphetamine-type substance use disorder and post-traumatic stress disorder ("PTSD") with a history of alcohol and cannabis use. Mother entered residential treatment after the assessment but left against therapeutic recommendation only days later.

¶5   By May 2019, Mother was living with Grandmother, the children, and her significant other, Denzel L. A Department of Child Safety ("DCS") case manager reported concerns about Mother's and Denzel's repetitive substance abuse and domestic violence, including an incident witnessed by the children in which Mother and Denzel—both highly intoxicated—had physically fought. That same day, Mother and Denzel left B.H. with a man named "Spider," who was reluctant to return B.H. because Mother and Denzel were visibly intoxicated. Another DCS worker reported Mother and Denzel tested positive for marijuana and methamphetamine in May 2019. Mother was routinely using illicit drugs before work, and while caring for B.H. Mother has bipolar disorder and borderline-personality disorder, and DCS was concerned she was self-medicating.

¶6   DCS then implemented an in-home safety plan and offered Mother family preservation services. As part of the safety plan, DCS required that approved monitors supervise all contact between B.H., Mother, and Denzel. Mother also agreed to participate in substance-abuse treatment through Native American Connections ("NAC") and to submit to urinalysis testing.

¶7   In June 2019, Mother completed an intake at NAC for substance-abuse and mental-health treatment, where she reported a history of psychiatric hospitalizations and that she had been diagnosed with PTSD, attention-deficit hyperactivity disorder, bipolar disorder, and mood disorder. Mother admitted actively using marijuana and alcohol to cope with her PTSD and daily stressors, but claimed sobriety from methamphetamine. The intake evaluator noted Mother demonstrated "no significant length of sobriety and minimal awareness" regarding her substance abuse and triggers, and recommended Mother participate in intensive outpatient services for her alcohol abuse and group sessions for her drug abuse. Mother was "ambivalent for treatment," however, and indicated she was only motivated by DCS' involvement. Mother did not fully engage in either service, and she tested positive for

tetrahydrocannabinol ("THC")—the main active ingredient in marijuana—once in May, three times in July, and twice in August.

**¶8**        In August 2019, one of the approved monitors reported to DCS that Mother had been acting erratically, tried to punch him during a verbal altercation, and slashed his tires. The monitor found marijuana paraphernalia and empty air cans used for "huffing" in Mother's bedroom. Mother tried to pick B.H. up from daycare without a monitor, but a DCS worker arrived at the daycare in time to remove B.H. from Mother's care.

**¶9**        DCS then placed B.H. with extended family and filed a petition alleging he was dependent as to Mother due to her substance abuse, domestic violence, and mental health issues. The juvenile court ultimately adjudicated B.H. dependent as to Mother.

**¶10**        As part of its family-reunification case plan, DCS offered Mother numerous services, including urinalysis and hair-follicle testing, substance-abuse assessment and treatment, psychological evaluations and consultations, mental-health and behavioral-health self-referrals, domestic-violence counseling self-referrals, team decision-making meetings ("TDM"), supervised visitation, and transportation.

**¶11**        At a TDM held two days after B.H.'s removal, Mother admitted she had "huffed" approximately one week earlier and she could no longer care for B.H. because she wanted to seek treatment for her substance-abuse and mental-health issues. Between August and November 2019, however, Mother submitted to only two drug tests, and both came back positive for THC. The testing provider suspended the service, and DCS ceased referring her for testing because she failed to remain in contact. She participated in another intake at the Community's behavioral health services, where she was diagnosed with alcohol-use disorder, cannabis-use disorder, and PTSD. She was referred for intensive outpatient sessions, but she began missing sessions, and the service provider discharged her in December 2019.

**¶12**        By January 2020, Mother had not seen B.H. since October 2019, and her whereabouts were unknown to DCS. DCS submitted family locate referrals for Mother, and she contacted DCS in February 2020, agreeing to meet with DCS. Although Mother failed to show up for the first scheduled meeting, she met with DCS in March 2020. Meanwhile, in February 2020, DCS submitted a request under the Interstate Compact for the Placement of Children ("ICPC") to place B.H. with Grandmother, who by then was living in Oklahoma with J.C.

4

¶13        In April 2020, Mother completed an intake for substance-abuse treatment with TERROS, where she claimed she began using marijuana at age seven and methamphetamine at age fourteen—claims in conflict with her prior reports.  She also claimed three years' sobriety from methamphetamine, three months' sobriety from alcohol, and two months' sobriety from marijuana.  Mother also reported she had been diagnosed with PTSD and bipolar disorder, although she suggested the latter may have been induced by substance abuse.  TERROS recommended Mother participate in standard outpatient care, call in daily for drug testing, and submit to testing as required.  From March through May 2020, however, she submitted to only eleven of twenty-five urinalysis tests, submitted six diluted samples, and tested positive for alcohol once.

¶14        DCS expressed concerns that Mother had made insufficient progress, remained unable and unwilling to perform essential responsibilities to meet B.H.'s immediate needs, and had not yet resolved lingering problems with substance abuse, domestic violence, housing, and employment.   DCS offered Mother mental-health services through TERROS, but she declined, stating she would seek services independently.  DCS also sought to arrange a psychiatric evaluation for Mother, but her inconsistent substance-abuse testing and a recent positive test result made it unclear whether she was appropriately sober for evaluation.

¶15        In June 2020, DCS moved to terminate Mother's parental rights to B.H.  As amended, the motion alleged the grounds of chronic substance abuse and six months' out-of-home placement.

¶16        That same month, Mother completed another intake with the Community's behavioral health services, where she admitted being both a victim and a perpetrator of domestic violence and continuing to drink alcohol once or twice per month.  The evaluator diagnosed Mother with PTSD, victim/spousal/partner abuse, and mild alcohol-use disorder.  She recommended Mother participate in domestic-violence classes and eye movement desensitization and reprocessing therapy.   The following month, however, Mother missed two of three therapy sessions.

¶17        In July 2020, Mother participated in a psychological evaluation with Dr. Nicole Mirkin.  Dr. Mirkin diagnosed Mother with severe amphetamine-type substance-use disorder, moderate cannabis-use and alcohol-use disorder, unspecified mood disorder, unspecified trauma-related and stressor-related disorder, and confirmed child neglect and spousal or partner physical violence.  Dr. Mirkin recommended Mother continue with standard outpatient treatment and domestic-violence classes;

obtain employment; find routine prenatal care; engage in urinalysis testing, individual therapy, parenting classes, one-on-one parent-aide skills sessions, and a twelve-step program; and continue supervised visits until she completed services and eliminated the safety risks to B.H.

¶18        From June to August 2020, Mother missed seven of twenty-nine drug tests, had one "refusal," and submitted four diluted samples.[4] In April and May 2020, Mother missed six of fifteen scheduled substance-abuse treatment sessions at TERROS, and she missed seven of thirteen such sessions in June and July, resulting in a pending closure from the service before she eventually reengaged. Further, her progress was insufficient to remedy the long-term and outstanding safety threats that made B.H. unable to reunify with her. Over the next couple of months, Mother submitted more diluted urine samples, missed TERROS group sessions, and missed a couple of domestic violence sessions.

¶19        In November 2020, the juvenile court held a one-day contested severance hearing. Mother's case manager testified Mother failed to participate in drug testing from October 2019 to March 2020 and failed to participate in other DCS-offered services from the end of October 2019 to the beginning of April 2020. Even after April 2020, her compliance with services was "less than adequate," her services were pending closure by July 2020, and even after July 2020, Mother continued to miss substance-abuse classes and testing and had some diluted tests. Her case manager opined that Mother's substance abuse impaired her ability as a caregiver, could render her moods unpredictable, made her more likely to engage in domestic violence, and could impact her ability to provide for B.H.'s basic needs and subject B.H. to neglect.

¶20        The case manager also testified Mother did not participate in behavioral health services through the Community from December 2019 through early June 2020 and failed to complete recommended trauma therapy and domestic-violence classes. Although DCS also offered Mother domestic-violence services, she did not believe domestic violence was a concern. Further, Mother's substantial neglect in failing to participate or fully engage in necessary services had delayed DCS' referral for a psychological evaluation and precluded a referral for parent-aide services.

¶21        The juvenile court terminated Mother's parental rights on the grounds of chronic substance abuse and six months' out-of-home

---

[4]      TERROS considered a diluted test to be a presumptive positive test.

placement.  We have jurisdiction over Mother's timely appeal.  *See* A.R.S. §§ 8-235(A), 12-2101(A)(1).

## ANALYSIS

### I. *Standard of Review and Applicable Law*

**¶22** As the trier of fact in a termination proceeding, the juvenile court is in the best position to weigh the evidence, observe the parties, judge witnesses' credibility, and resolve disputed facts.  *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (citation omitted).  We will not reweigh the evidence or redetermine the witnesses' credibility.  *See Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151, ¶ 18 (2018).  We also will not reverse for insufficient evidence unless no reasonable evidence supports the court's factual findings.  *Matthew L.*, 223 Ariz. at 549, ¶ 7.

### II. *Termination Based on Substance Abuse*

**¶23** Mother argues reasonable evidence does not support termination of her parental rights on the ground of chronic substance abuse.

**¶24** The juvenile court may terminate parental rights if it finds by clear and convincing evidence that a parent is unable to discharge parental responsibilities due to a history of chronic abuse of dangerous drugs, controlled substances, or alcohol, and there are reasonable grounds to believe the condition will continue for a prolonged indeterminate period.  A.R.S. §§ 8-533(B)(3), -537(B).  Substance abuse is chronic when it is long-lasting but not necessarily constant.  *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 377, ¶ 16 (App. 2010).  A parent's temporary abstinence from drugs and alcohol does not outweigh a significant history of abuse or consistent inability to abstain during the case.  *Id.* at 379, ¶ 29.  Instead, a child's interest in permanency must prevail over the parent's uncertain battle with substances, and the child should not be forced to wait for the parent to "grow up."  *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 17 (App. 2016) (citations omitted).  When determining whether reasonable grounds exist to believe a parent's substance abuse will continue for a prolonged indeterminate period, courts must consider a parent's treatment history to gauge the likelihood the parent will be capable of parenting in the foreseeable future.  *Raymond F.*, 224 Ariz. at 378, ¶ 25 (citation omitted).  "Where the parent has been unable to rise above the addiction and experience sustained sobriety in a noncustodial setting, and establish the essential support system to maintain sobriety, there is little hope of success in parenting."  *Id.* (quoting *In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998)).Here, the juvenile court found Mother (1) had failed

to establish a significant period of sobriety through consistent, negative testing, (2) had poor insight into the depth of her addiction, (3) continued to lie about her sobriety, and (4) had only participated inconsistently in family-reunification services.

¶26 Reasonable evidence supports the court's findings. Between May 2019 and the termination hearing, Mother tested positive for marijuana seven times, submitted thirteen diluted specimens, and completely failed to test or even call in for testing from the end of August 2019 to the beginning of March 2020. After DCS removed B.H. from Mother's custody in August 2019, the only time she demonstrated anything resembling sobriety was for approximately six to eight weeks from mid-July to September 2020. Still, even over that period, she failed to submit to testing several times.

¶27 Mother also reported to Dr. Mirkin that she had at least two failed attempts at rehabilitation between 2015 and 2017. In July 2018, she entered a residential treatment program after relapsing with methamphetamine but left the program against therapeutic advice after only a few days. In 2019, Mother told DCS she would go to NAC for substance-abuse treatment but failed to participate in the recommended intensive outpatient services for alcohol or group sessions for her drug use. In September 2019, Mother self-referred to the Community's behavioral health services, but was discharged due to lack of contact by early December. In April 2020, Mother participated in an intake at TERROS for substance-abuse treatment, but by August 2020, she had missed thirteen of twenty-eight treatment sessions and the service was pending closure. Although Mother reengaged in the service, she had not completed TERROS substance-abuse treatment by the time of the severance hearing.

¶28 Additionally, reasonable evidence supports that Mother's substance abuse would continue for a prolonged indeterminate period. Dr. Mirkin opined that Mother was unable to maintain a positive attitude or cope with stressors effectively without using drugs and alcohol and her insight into her addiction remained poor. The prognosis for Mother to demonstrate minimally adequate parenting skills or prolonged sobriety in the foreseeable future was also poor, and "[h]er motivation to alter the trajectory of her addiction [was] poor for many reasons starting with her lack of insight into her addiction, as evidenced by her lack of participation [in] services and continued drug use despite DCS involvement." Dr. Mirkin also opined that Mother's substance abuse would "continue to contribute to her poor relationship choices and dysfunctional parenting" and that "[h]er attendance and response to services [was] necessary in order to

diminish these risk factors." At the termination hearing, Dr. Mirkin opined that Mother's insight into her addiction continued to be inadequate because she continued to lie about her sobriety, failed to participate in services, continued to use substances despite DCS' involvement, and did not take responsibility for her involvement leading up to DCS' intervention.

**¶29** Given Mother's long-standing failure to maintain sobriety, lack of progress, and minimal engagement in services, we conclude reasonable evidence supports the juvenile court's finding that there were reasonable grounds to believe Mother's chronic substance abuse would continue for a prolonged indeterminate period.[5] Accordingly, we affirm the termination of Mother's parental rights on the ground of chronic substance abuse.[6]

> III.     *The Court's Best Interest Finding*

**¶30** Mother also argues reasonable evidence does not support that terminating her parental rights was in B.H.'s best interest.

**¶31** Before severing parental rights, the juvenile court must not only find a statutory ground for severance under § 8-533(B), it must also determine by a preponderance of the evidence that severance is in a child's best interest. *Alma S.*, 245 Ariz. at 149-50, ¶ 8. The court's primary concern must be the child's interest in stability and security. *Id.* at 150, ¶ 12 (citations omitted).

**¶32** In determining best interests, the juvenile court must consider the totality of the circumstances existing at the time of severance and find how the child will either benefit from severance or be harmed by continuing the parent-child relationship. *Id.* at ¶ 13; *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). A child may benefit if a current adoptive plan

---

[5]     Mother does not challenge the court's findings that she had a history of chronic substance abuse, her substance abuse rendered her unable to discharge her parental responsibilities, and DCS made reasonable efforts to reunify the family. She therefore concedes the accuracy of those findings. *See Britz v. Kinsvater*, 87 Ariz. 385, 388 (1960).

[6]     Because sufficient evidence supports severance on the ground of chronic substance abuse, we do not address Mother's argument that the court erred in severing her parental rights on the ground of six months' out-of-home placement. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

exists, *see JS-500274*, 167 Ariz. at 6, if DCS can show the child is adoptable, *Alma S.*, 245 Ariz. at 150-51, ¶¶ 13-14, or if the child "would benefit psychologically from the stability an adoption would provide," *Maricopa Cnty. Juv. Action No. JS–501904*, 180 Ariz. 348, 352 (App. 1994). The court may also consider whether the existing placement meets the child's needs and adoption is otherwise legally possible and likely. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3-4, ¶ 12 (2016) (citations omitted).

¶33 The court may find the child would be harmed by continuing the parent-child relationship "where there is clear and convincing evidence of parental unfitness[,] which has not been remedied notwithstanding the provision of services by [DCS] and which detrimentally affects the child's well-being." *Pima Cnty. Juv. Action No. S-2460*, 162 Ariz. 156, 158 (App. 1989); *see also Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98, ¶ 11 (App. 2016) (recognizing a child may be harmed by the continuation of the parent-child relationship if the continued presence of a statutory severance ground negatively affects the child). The presence of a statutory ground will usually harm the child. *Maricopa Cnty. Juv. Action No. JS-6831*, 155 Ariz. 556, 559 (App. 1988).

¶34 Here, Mother does not challenge the juvenile court's findings, supported by reasonable evidence, that B.H. was adoptable; B.H.'s placement was ICWA-compliant and intended to adopt him; B.H.'s placement met all his needs; B.H.'s placement was providing him with a loving and nurturing environment where he was thriving; and adoption would provide B.H. with stability and permanency and allow him to be raised in a home free of substance abuse and domestic violence.[7] Mother, therefore, concedes the accuracy of these findings. *See Britz*, 87 Ariz. at 388.

¶35 Mother claims the juvenile court abused its discretion by failing to consider the separation of siblings. However, the court considered the totality of the circumstances and found that although B.H.'s placement was not with family, it was ICWA-compliant, and B.H. had been previously placed with family, but that placement had been disrupted. Although J.C. lived under Grandmother's guardianship and DCS attempted to place B.H. with Grandmother through the ICPC, Oklahoma denied the placement. As to Mother's claim the court abused its discretion by not considering her rehabilitation efforts, the court specifically

---

[7] The case manager also testified that not terminating Mother's parental rights would be detrimental for B.H. because he would remain subject to decision-making that was out of his control, and he would not be able to "move on" and achieve a sense of normalcy.

considered Mother's participation in services and found she had failed to engage in services, including visitation, for a significant period. Accordingly, reasonable evidence supports the juvenile court's finding that terminating Mother's parental rights was in B.H.'s best interest.

## CONCLUSION

**¶36**        The juvenile court's order terminating Mother's parental rights to B.H. is affirmed.

