NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

CHARLES M., *Appellant,*

*v.*

ELENA K., K.M., *Appellees.*

No. 1 CA-JV 22-0157
FILED 1-31-2023

Appeal from the Superior Court in Maricopa County
No. JS20902
The Honorable Genene Dyer, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Thomas Vierling Attorney at Law, Phoenix
By Thomas A. Vierling
*Counsel for Appellant*

Jeffrey M. Zurbriggen PC, Phoenix
By Jeffrey M. Zurbriggen
*Counsel for Appellees*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the court, in which Presiding Judge David D. Weinzweig and Judge D. Steven Williams joined.

---

**H O W E**, Judge:

¶1        Charles M. ("Father") appeals the juvenile court's order terminating his parental rights to his child, K.M. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        Father and Elena K. ("Mother") are the parents of K.M., born in 2009. Father abused alcohol and was abusive towards Mother and her children, but they remained together "on and off" until 2015. During the relationship, K.M. was a victim of and witnessed Father's abuse. Mother phoned police during some of these incidents. Father attended anger-management classes. In 2015, Mother and K.M. moved to another state; Father remained in Arizona.

¶3        Soon after the relationship ended, Father petitioned for parenting time and the court ordered regular phone calls and visits with K.M. to be supervised by K.M.'s paternal aunt or grandmother. Soon after that order, K.M. flew to Arizona to visit with Father. She returned very upset from the visit and disclosed that the paternal relatives were not supervising her time with Father as the visitation order required. That was the last time Father saw K.M. in person.

¶4        In 2016, the court modified its order to eliminate Father's in-person visits but allowed him regular phone calls and emails. Phone calls with Father upset K.M. because he often called while intoxicated and would focus heavily on and speak disrespectfully about Mother rather than focus on K.M.

¶5        In early 2017, when K.M. was seven years old, Father was imprisoned on felony charges, including aggravated driving under the influence. His projected release date was in January 2027. While imprisoned, he contacted K.M. by phone or email but continued to focus his conversations on Mother rather than the child, and his relationship with K.M. did not improve.

2

**¶6**             In 2019, the court limited his parenting time to emails only. The next year, K.M. began individual counseling. She was diagnosed with post-traumatic stress disorder ("PTSD") and general anxiety disorder, all of which stemmed from "past trauma she experienced and witnessed at the hand of her father." In 2021, Father and K.M. participated in family counseling for five months, but their relationship did not improve. Around this time, Mother petitioned to terminate Father's parental rights under the length-of-felony-sentence ground. *See* A.R.S. § 8–533(B)(4). The court held a trial during which Mother testified that in 2015, K.M. had more parenting time with Mother than Father. She also testified that in her care, K.M. was close with her other siblings, responsible for caring for pets, and involved in community activities. She added that K.M. and Mother's husband ("Stepfather") had a parent-child relationship. Father testified about the parties' relationship and that Mother is a "great mother."

**¶7**             The court terminated Father's parental rights. The court made factual findings under *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251–52 ¶¶ 28–29 (2000), to determine that his incarceration deprived K.M. of a normal home with him. Specifically, it found that Mother "ha[d] been the primary parent for the entirety of the minor child's life," and that the "child ha[d] a normal life that include[d] taking care of family pets, participating in school activities and spending time with friends and family members." Father tried to maintain contact with K.M. during his incarceration through phone and email, but the court found that he was "unable to participate in the everyday life of" K.M. and "do the ongoing work to repair and progress the parental relationship." The court further found that Father's incarceration "prevent[ed] him from having meaningful therapeutic interactions with [K.M.] that would result in the minor child wishing to have a relationship with him." During his brief weekly phone calls, Father fixated negatively on Mother rather than on K.M.'s wellbeing. The court noted K.M.'s repeated desire to end her relationship with Father and be adopted by Stepfather.

**¶8**             The court also found that Mother proved by a preponderance of the evidence that termination of Father's parental rights would be in K.M.'s best interests. K.M. would benefit from termination because Mother and Stepfather had been meeting her needs and Stepfather wanted to adopt her. The court further found that maintaining the parent-child relationship would be detrimental to K.M. because of Father's past violence, which negatively affected her mental health. Father timely appealed.

**DISCUSSION**

¶9            Father argues that the juvenile court erred in not considering whether Mother was providing the child with a "normal home" and finding that termination was in K.M.'s best interests. "We review an order terminating a parent's relationship with his or her child . . . in the light most favorable to sustaining the superior court's ruling." *Calvin B. v. Brittany B.*, 232 Ariz. 292, 296 ¶ 17 (App. 2013). We will affirm unless, as a matter of law, no reasonable evidence supports those findings. *Ariz. Dep't of Econ. Sec. v. Rocky J.*, 234 Ariz. 437, 440 ¶ 12 (App. 2014).

¶10          As a threshold matter, Father asserts that the court's findings cannot provide meaningful review because the court failed to expressly show how it applied each of the termination-ground factors. This court reviews de novo the sufficiency of the court's written findings. *Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 240 ¶ 20 (App. 2012). To comport with due process, the court's termination order must be written and signed and set forth supportive findings of fact for both the termination grounds and the best-interests determination. A.R.S. § 8–538(A); *Logan B. v. Dep't of Child Safety*, 244 Ariz. 532, 535 ¶ 1 (App. 2018). At a minimum, the juvenile court must "specify at least one factual finding sufficient to support each of [its] conclusions of law." *Ruben M.*, 230 Ariz. at 240 ¶ 22. The purpose behind this requirement "is to allow the appellate court to determine exactly which issues were decided and whether the lower court correctly applied the law." *Id.* at 240 ¶ 24.

¶11          Here, the court had to determine whether Father's felony sentence was long enough to deprive K.M. of a normal home for a period of years. A.R.S. § 8–533(B)(4); *see Michael J. v Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251–52 ¶ 29 (2000). In doing so, the court had to

> consider all relevant factors, including, but not limited to: (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue. After considering those and other relevant factors, the trial court

can determine whether the sentence is of such a length as to deprive a child of a normal home for a period of years.

*Id.*

**¶12**      In its final order, the court made numerous factual findings under each of the enumerated *Michael J.* factors and additional factual findings in a section labeled "[o]ther relevant factors." It also expressly concluded that Mother had proved, by clear and convincing evidence, that Father was convicted of a felony and that the length of his sentence would deprive K.M. of a normal home for a period of years. Nonetheless, because the court did not expressly state how it was analyzing each of the factors, Father contends this court cannot provide effective review. But the juvenile court was required only to "specify at least one factual finding sufficient to support each of [its] conclusions of law." *Ruben M.*, 230 Ariz. at 240 ¶ 22. The order clearly shows that the court did so here. It made numerous factual findings about Father's strained relationship with K.M. and how their relationship detracts rather than contributes to K.M.'s stable family environment. *See Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 477 ¶ 27 (2022). Thus, the juvenile court's order is thorough enough to allow this court to provide effective review. The court therefore did not err.

**¶13**      The court also did not err in finding that Father's incarceration deprived K.M. of a normal home with him. Under A.R.S. § 8–533(B)(4), a normal home is "a stable and long-term family environment outside a foster care placement, where another parent . . . resides and parents the child, and where the incarcerated parent affirmatively acts to maintain a relationship with the child that contributes to rather than detracts from the child's stable, family environment." *Timothy B.*, 252 Ariz. at 477 ¶ 27. A "normal home" does not necessarily require an incarcerated parent's presence. *Id.* at 476 ¶ 24.

**¶14**      Here, reasonable evidence exists to support the court's findings. The court expressly considered that Mother was providing K.M. with a normal home. It found that she had been K.M.'s primary parent for her entire life and that K.M. had a normal life that involved "taking care of family pets, participating in school activities and spending time with friends and family members." The court also considered that Father tried to maintain contact with K.M. during his incarceration through phone and email.

**¶15**      Nevertheless, the court made many findings implying that Father's relationship with K.M. detracts from rather than contributes to her

stable, family environment. For example, the court found that Father was unable to participate in K.M.'s everyday life and "do the ongoing work to repair and progress the parental relationship." His incarceration "prevent[ed] him from having meaningful therapeutic interactions with [K.M.] that would result in the minor child wishing to have a relationship with him." His brief weekly phone calls could not repair their strained parent-child relationship. The court found that Father squandered his time with K.M. by fixating negatively on Mother rather than on K.M.'s wellbeing. The court noted K.M.'s repeated desire to end her relationship with Father and be adopted by Stepfather.

¶16 Moreover, the record supports the court's finding that after some phone calls with Father, K.M. was visibly upset and cried; she felt he was not truly interested in their relationship based on his fixation with Mother. Due to their strained relationship, K.M. was unable to share her feelings with him during family counseling. Her individual counselor diagnosed her with generalized anxiety disorder and found her symptoms consistent with PTSD, stemming from past trauma she experienced from Father. Considering the court's comprehensive findings and the supportive evidence in the record, the juvenile court did not misapply the term "normal home." *Cf. Timothy B.*, 252 Ariz. at 477 ¶ 28 (holding the juvenile court erred by "ground[ing] its ruling on only [the incarcerated parent's] inability to be physically present in [the child's] home").

¶17 Father further asserts that the juvenile court erred by not finding that Mother persistently and substantially restricted his access to K.M. under *Calvin B.*, 232 Ariz. 292. But *Calvin B.* is inapplicable here because Mother did not petition to terminate his parental rights based on abandonment. *See id.* at 293–94 ¶ 1 (holding that "a parent who has persistently and substantially restricted the other parent's interaction with their child may not prove abandonment based on evidence that the other has had only limited involvement with the child"). Further, Father moved to enforce his parenting time in family court and was able to raise his grievances with Mother's compliance to the visitation orders there.

¶18 Father cites *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574 (2021), and *Alyssa W. v. Justin G.*, 245 Ariz. 599 (App. 2018), to argue that the court erred in not determining whether Mother made diligent efforts to provide him services for maintaining a bond with K.M. But *Jessie D.* is inapplicable because it does not extend to private petitioners. *See* 251 Ariz. at 582 ¶ 21 (holding that Department of Child Safety must make reasonable efforts to provide incarcerated parent services upon request, "providing the services will not endanger the child"). *Alyssa W.* is also inapplicable because

Mother did not seek termination based on chronic substance abuse. *See* 245 Ariz. at 602 ¶ 13 (holding that a private petitioner seeking termination under the chronic substance-abuse ground must show "*that services were offered*, but the parent's [substance] abuse was not amendable to rehabilitative services, or that providing such services would be pointless"). Further, the *Alyssa W.* court clarified that a private party, who often lacks the resources available to the State, need not "herself have offered or provided" the services. *Id.* at 602 ¶ 14. Regardless, even if Mother was required to show that some form of visitation was available to Father, she has done so here. Both parents testified that the court granted Father varying degrees of parenting time with K.M., even during his incarceration. Therefore, the court did not err.

**¶19**       Finally, Father contends the juvenile court's finding that termination was in K.M.'s best interests is clearly erroneous because her life would not change if termination were denied. In addition to finding a statutory ground for termination, the juvenile court must also determine what is in the best interests of the child by a preponderance of the evidence. *Kent K.*, 210 Ariz. at 284 ¶ 22. Once the court finds a parent unfit under at least one statutory ground for termination, "the interests of the parent and child diverge," and the court proceeds to balance the unfit parent's "interest in the care and custody of his or her child . . . against the independent and often adverse interests of the child in a safe and stable home life." *Id.* at 286 ¶ 35. "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). Courts "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148 ¶ 1 (2018).

**¶20**       The court may find that a child would benefit from termination if an adoption plan exists or the child is adoptable, *id.* at 150–51 ¶¶ 13–14, or if the child "would benefit psychologically from the stability an adoption would provide," *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352 (App. 1994). Conversely, the court may find a child would be harmed by the continuation of the parent-child relationship where "clear and convincing evidence of parental unfitness" exists, "which has not been remedied notwithstanding the provision of services by [DCS] and which detrimentally affects the child's well-being." *Pima Cnty. Juv. Action No. S-2460*, 162 Ariz. 156, 158 (App. 1989).

¶21 Here, reasonable evidence supports the court's finding that termination was in K.M.'s best interests. The juvenile court found that she would benefit from termination because Mother and Stepfather had been meeting her needs and Stepfather wanted to adopt her. He had been K.M.'s father figure for more than five years. The court further found that maintaining the parent-child relationship would be detrimental to K.M. because of Father's past violence, which negatively affected her mental health. The record supports these findings and establishes how K.M.'s life would indeed change with the termination of Father's parental rights.

## CONCLUSION

¶22 For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA