804 P.2d 730

**In the Matter of the APPEAL IN MAR-
ICOPA COUNTY JUVENILE
ACTION NO. JS-500274.**

**No. CV-89-0379-PR.**

Supreme Court of Arizona.
En Banc.

Sept. 18, 1990.

Carmichael & Powell, P.C. by Laurence B. Stevens and Claudia J. Kroman, Phoenix, for Natural Father.

Helm & Kyle, Ltd. by Margaret R. Tinsley, Tempe, for Natural Mother.

## OPINION

MOELLER, Justice.

### JURISDICTION

In this proceeding a mother seeks to terminate a father's parental rights. The juvenile court found the father had abandoned his son and granted the request for termination. The court of appeals reversed, holding that, notwithstanding the finding of abandonment, the termination order was not supported by evidence showing that termination was in the best interests of the child. 163 Ariz. 19, 785 P.2d 588. Pursuant to Rule 28, Rules of Procedure for the Juvenile Court, 17B A.R.S., we granted the mother's petition for review in part. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3).

### FACTS

We use only fictitious first names for the parties and the child. Gary and Lynn are the natural father and mother of Bobby, born December 7, 1984. They met in November 1983 when Lynn was a senior in high school and Gary was a freshman in college. By April 1984, Lynn realized she was pregnant. Gary assisted in preparations for the birth and attended birthing classes. He was present when Bobby was born and paid half of the medical bills for the birth. He again paid half of the medical bills when Bobby was readmitted to the hospital for a subsequent medical problem.

During the spring of 1985, Lynn and the baby lived with Lynn's parents, where Gary regularly visited. In June of 1985, Gary went to Alaska, where his parents lived, to work on an oil rig. During that summer Gary sent Lynn a $100 check each month. Towards the end of the summer, at Gary's request, Lynn flew to Alaska to meet Gary's parents. While in Alaska, Gary bought Lynn a ring and they became engaged to be married. In the fall, Gary purchased Lynn a car and drove back to Arizona to resume school.

From August 1985 to April 1986 Gary visited Lynn and Bobby once or twice a week. However, Gary's relationship with Lynn deteriorated and they "separated" in April 1986. After the breakup, Gary did not start visiting his child until June 1986. During the summer Gary visited Bobby about three times a week, and they would swim or eat dinner together.

In August 1986, Gary and Lynn resumed their relationship. They took Bobby to visit Gary's grandmother in Hawaii that same month, and Gary paid for the trip. Upon their return, Gary returned to school and part-time work. He went to Lynn's house regularly to see his son. However, on February 7, 1987, Lynn unexpectedly terminated the relationship.

At the time of the breakup, Lynn indicated to Gary she did not want the breakup to affect Gary's relationship with Bobby. Gary did see his child on February 22, 1987, when he went to Lynn's house to return some of her items. Testimony at trial indicated that Gary was emotionally shaken by the breakup.

Gary did not go to see Bobby again, but Lynn took Bobby to see Gary on August 20, 1987, because she was upset that Gary had not come to see his son since February. The meeting resulted in some testiness. Lynn refused to let Gary wake Bobby who was sleeping at the time, and Gary stated

that if he could not be "a 100% father" to Bobby, he would not be a father at all. The meeting ended with Lynn advising Gary that he would not see his son again.

After this meeting there was no further contact between Gary and Bobby. Gary provided no support, gifts, cards or letters, and made no phone calls. Gary's mother continued to call, write and send gifts to Bobby until December 1987 when Lynn argued with her over an unrelated matter.

Lynn initiated a Petition for Termination of Parental Rights on June 20, 1988. Gary opposed the petition and filed a separate Complaint to Establish Paternity and Parental Rights. Pursuant to A.R.S. § 8–536, the trial court appointed a caseworker, Sue L. McLaughlin, to investigate the situation and make a preliminary recommendation on the issue of termination. McLaughlin sent form letters to Gary and Lynn. On July 25, 1988, McLaughlin met with Lynn and her mother for approximately one hour. McLaughlin did not speak with Bobby, who was then about three and a half years old. Before speaking to Gary, McLaughlin submitted her report on July 27, 1988. In it, she attributes the following statement to Lynn: "If Gary was serious about having a relationship with Bobby, she [Lynn] would let him see the child." Report at p. 4. Without further investigation, McLaughlin recommended termination of Gary's parental rights.

Gary called McLaughlin on July 29, 1988, to ask some questions. McLaughlin talked to him for fifteen minutes and asked him some questions and then filed an addendum to her report reflecting the conversation. She noted that she thought there was "room for negotiation" in the case but, once again, recommended termination.

At trial, Lynn explained that she sought to terminate Gary's parental rights so she could name her parents in her will as guardians for Bobby. Additionally, she explained that, in case she married, she wanted her future husband to be able to adopt Bobby.

Gary did not contest Lynn's custody of Bobby, nor did he dispute that Lynn provides a secure and caring environment for him. Gary contended, however, that he had not abandoned his son. He also claimed that his absence from his son's life from February 1987 to August 1988, was excused by extenuating circumstances. He also claimed that he could not visit Bobby at Lynn's parents' home because of the emotional upheaval of the breakup, and because he did not want his son to witness any further arguments between him and Lynn. Gary claimed there was hostility in Lynn's house, and he did not feel welcome. He also argued that his only source of transportation at the time was a motor scooter, and he did not feel it was safe to transport Bobby to another location on this vehicle.

The trial court found that although Gary is "more mature now and is sincere in his desire to establish a father-son relationship with the child," he absented himself from Bobby's life for a period of eighteen months without justification. Therefore, the trial court concluded, abandonment was shown by clear and convincing evidence. Additionally, the trial court found that severance would serve the best interests of Bobby.

The court of appeals reversed the termination order, holding that the evidence did not support a finding that termination was in the best interests of the child. The court of appeals stated that before there may be a lawful termination, the "state" must show that the child is jeopardized by continuation of the parental relationship. There being no showing of such jeopardy, the court of appeals reversed the termination order. Although we disagree with some of the court of appeals' reasoning, we agree with the result it reached.

### ISSUE PRESENTED

Whether there is sufficient evidence to support the finding that termination of parental rights would be in the best interests of the child.

### DISCUSSION

 The mother's petition for termination relied on the statutory basis of abandonment. A.R.S. § 8–533(B)(1) provides:

B. Evidence sufficient to justify the termination of the parent-child relationship shall include any one of the following, and in considering any of the following grounds, the court may also consider the needs of the child:

1. That the parent has abandoned the child. ....

"Abandoned" is defined in § 8–546(A)(1), which provides:

"Abandoned" means the failure of the parent to provide reasonable support and to maintain regular contact with the child, including the providing of normal supervision, when such failure is accompanied by an intention on the part of the parent to permit such condition to continue for an indefinite period in the future. Failure to maintain a normal parental relationship with the child without just cause for a period of six months shall constitute prima facie evidence of abandonment.

■ In order for abandonment to exist, there must be clear and convincing evidence of intentional conduct on the part of a parent that evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. *Matter of Appeal in Pima County Severance Action No. 1607*, 147 Ariz. 237, 238, 709 P.2d 871, 872 (1985). The concept of abandonment and terms such as "reasonable support" or "normal parental relationship" are somewhat imprecise and elastic. Therefore, questions of abandonment and intent are questions of fact for resolution by the trial court. *Appeal of Maricopa County Juvenile Action No. JS–4283*, 133 Ariz. 598, 601, 653 P.2d 55, 58 (App.1982).

The trial court found a prima facie case of abandonment because the father had no contact with his son for more than six months. The trial court found "the father has not made a sincere effort to maintain a parental relationship with his child, has put his own needs ahead of his child's, consciously disregarding his parental rights and responsibilities, and has demonstrated by his conduct an intent to abandon his relationship with his child." The trial court

also found that the father failed to establish "just cause" for his absence.

As we read the court of appeals' opinion, the validity of the abandonment finding is assumed. The father has not challenged this finding by cross-petition. Consequently, we do not ascertain, but simply assume for purposes of this review, that the finding of statutory abandonment is reasonably supported by the record.

■ Nonetheless, a finding of the statutory grounds of abandonment standing alone does not permit termination of parental rights. A severance must also be in the best interests of the child. *Matter of Appeal in Maricopa County Juvenile Action No. JS–6831*, 155 Ariz. 556, 748 P.2d 785 (App.1988). *See Action No. S–1607*, 147 Ariz. at 238, 709 P.2d at 872.

This court and the United States Supreme Court have long recognized that the right to the control and custody of one's children is a fundamental one. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Matter of Appeal in Cochise County Juvenile Action No. 5666–J*, 133 Ariz. 157, 161, 650 P.2d 459, 463 (1982); *Appeal in Pima County Juvenile Action No. J–46735 v. Howard*, 112 Ariz. 170, 171, 540 P.2d 642, 643 (1975). As the United States Supreme Court recognized in *Santosky v. Kramer*, this fundamental right "does not evaporate simply because" the natural parents "have not been model parents or have lost temporary custody of their child to the state.'" 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982).

Several courts have noted that termination of parental rights is not favored and that it generally should be considered only as a last resort. *Matter of Appeal in Maricopa County Action Nos. JS–5209 and JS–4963*, 143 Ariz. 178, 189, 692 P.2d 1027, 1038 (1984); *see also Department of Econ. Sec. v. Mahoney*, 24 Ariz.App. 534, 537, 540 P.2d 153, 156 (1975) (termination of the parent-child relationship should not be considered a panacea but should be resorted to only when concerted efforts to preserve the relationship fails); *Anonymous v. Anonymous*, 25 Ariz.App. 10, 11,

540 P.2d 741, 742 (1975) (severance is a serious matter and courts should "bend over backwards," if possible, to maintain the natural ties of birth); *In re Adoption of Hyatt*, 24 Ariz.App. 170, 176, 536 P.2d 1062, 1068 (1975) (the state and its courts should do everything in their power to keep the family together and not destroy it); *Action No. 5666–J*, 133 Ariz. at 159, 650 P.2d at 461 (the permanency of termination dictates that it be resorted to in only the most extreme cases). In fact, the legislative purpose of the Child Welfare and Placement Law set forth in Laws 1970, Ch. 153 § 1, states that "[i]mplicit in this act is the philosophy that, wherever possible, family life should be strengthened and preserved ..."; *see also Hernandez v. State ex rel. Department. of Econ. Sec.*, 23 Ariz. App. 32, 36, 530 P.2d 389, 593 (1975).

 Considering the interests at issue, the courts of this state have concluded that although the best interests of the child alone may not be sufficient to grant termination, they may be sufficient to deny termination. In other words, best interests of the child are a necessary, but not exclusively sufficient, condition for an order of termination. But the best interests of the child could be a sufficient reason for a denial of termination. *Action No. JS–6831*, 155 Ariz. at 559, 748 P.2d at 788; *Appeal of Maricopa County Juvenile Action No. JS–6520*, 157 Ariz. 238, 245, 756 P.2d 335, 342 (App.1988); *see Pima County Juvenile Action No. S–2460*, 162 Ariz. 156, 157, 781 P.2d 634, 635 (App.1989).

 The important consideration here is that there are fundamental constitutional rights involved in severance cases. Such constitutional rights can be overridden only by the combined elements of statutorily defined improper behavior by the parent and the child's best interests. The question then is: In light of the fundamental parental rights at stake, what type of evidence of the child's best interest is sufficient to support a severance? Some guidance is contained in the United States Supreme Court *Santosky* opinion, which stated, "[u]ntil the state proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." 455 U.S. at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611. The Supreme Court then added in a footnote, "[n]or is it clear that the state constitutionally could terminate a parent's rights *without* showing parental unfitness." *Id.* at 759 n. 10, 102 S.Ct. at 1398 n. 10, 71 L.Ed.2d at 611 n. 10 (emphasis in original).[1]

Arguably, the mere fact of abandonment could be considered sufficient to prove unfitness. But our courts of appeal have concluded that if the constitutional rights at stake are to be adequately protected, a determination of the child's best interest must include a finding as to how the child would benefit from a severance *or* be harmed by the continuation of the relationship. *Juvenile Action No. JS–6520*, 157 Ariz. at 246, 756 P.2d at 343; *Matter of Appeal in Pima County Juvenile Action No. S–111*, 25 Ariz.App. 380, 390, 543 P.2d 809, 819 (1975); *Hyatt*, 24 Ariz.App. at 176, 536 P.2d at 1068; *see also Action No. 5666–J*, 133 Ariz. at 161, 650 P.2d at 463; *Action No. JS–6831*, 155 Ariz. at 559, 748 P.2d at 788.

 The court of appeals in this case stated that there must be a showing that the child is "jeopardized" by the parental relationship before a termination can be granted. Lynn argues that the court of appeals engrafted a third requirement—jeopardy—in addition to abandonment and best interest. We disagree. The court of appeals merely concluded that a finding of abandonment cannot be equated with a finding of best interest. We cannot assume that a child will benefit from a termi-

---

1. Lynn contends in this case that because the Department of Economic Security is not a party, there is no state involvement that would implicate the federal constitutional rights discussed in *Santosky*. Hence, Lynn argues, the requisite burdens are different. However, as the court of appeals noted, "the word 'state' in the *Santosky* decision is used both to refer to the party bringing the petition to terminate parental rights and to refer to the judicial system which enters an order of termination." *Matter of Appeal in Maricopa County Juvenile Action No. JS–4130*, 132 Ariz. 486, 487 n. 1, 647 P.2d 184, 185 n. 1 (App.1982).

nation simply because he has been abandoned. Rather, petitioner must prove an affirmative benefit to the child resulting from termination. *See No. JS–6831*, 155 Ariz. at 559, 748 P.2d at 788. For example, petitioner might prove that there is a current adoptive plan for the child *or* that the child will be freed from an abusive parent. This reasoning reflects an unspoken assumption that a parent, even an inadequate one, is better than no parent at all unless the child can somehow benefit from losing his natural parent.

For example, in *Juvenile Action No. J–87–119*, 161 Ariz. 537, 779 P.2d 1276 (App. 1989), although the father did not know the whereabouts of the mother and child, the court of appeals affirmed the trial court's termination order. The court noted that the father could have conducted a minimally diligent search to find the whereabouts of his child even though the mother was actively concealing herself from him. Furthermore, the mother's second husband had already filed adoption papers for the child and, therefore, the child would receive a tangible benefit from the termination which supported the best interest finding. In *Juvenile Action No. JS–6520*, 157 Ariz. 238, 756 P.2d 335 (App.1988), the court of appeals reversed a termination order when the twelve- and eleven-year-old children were probably unadoptable, and petitioner failed to prove a specific benefit that would be bestowed upon the children by the termination. Likewise, in *Juvenile Action No. JS–6831*, 155 Ariz. 556, 748 P.2d 785, the trial court found that the mother had abandoned her children, but refused to terminate, based on the best interests of the children. The court of appeals affirmed, noting that there was no current adoption potential for the children, and the children were not traumatized by the possibility of contact with their mother.

Lynn contends that requiring proof of a tangible harm or benefit to the child is a significant expansion of petitioner's burden of proof, and that Division Two of the court of appeals is in conflict with Division One as to the propriety of that expansion. We do not believe that we are expanding Arizona law by our holding today, nor do we perceive a conflict between Divisions One and Two.

Lynn relies on two inapposite cases decided by Division Two in 1989. In *Pima County Juvenile Action No. S–2462*, 162 Ariz. 536, 785 P.2d 56 (App.1989), DES sought to terminate the parental rights of a father accused of murdering a mother. The trial court granted the order and the court of appeals affirmed. The father, relying on *Juvenile Action No. JS–6520*, argued that because no present plan existed to adopt the children, his rights could not be terminated. Division Two distinguished *JS–6520* because it was an abandonment case, while the case before it was an abuse case. It noted that the children were placed at risk of harm because the father had murdered the mother in the presence of the children and the father had a history of physical and, possibly, of sexual abuse of one of the children; these facts were sufficient to find that the best interests of the children would be served by termination.

The second Division Two case Lynn relies on is *Juvenile Action No. S–2460*, 162 Ariz. 156, 781 P.2d 634 (App.1989). In that case, the court held that an adoption plan need not exist in order to sever a parental relationship on the ground of abandonment. However, the court stated:

As we read the statute, if the juvenile court finds that there is clear and convincing evidence that the requirements of subsection (B)(6)(b) [abandonment] have been met, it has the discretion to order severance. In exercising that discretion, as Division One suggests, it must consider the benefit of severance to the child as against the detriment should severance be denied. The immediate availability of an adoptive placement obviously weighs in favor of severance, while the improbability of adoption, absent other factors, weighs against it. But the availability of adoption is not the sole criterion. *As this case clearly shows, continuation of the parent-child relationship may have such negative consequences for the child that severance is warranted even though an*

*adoptive placement is unavailable. In such circumstances, we believe the juvenile court does not abuse its discretion in ordering severance.*

*Id.* at 158, 781 P.2d at 636 (emphasis added). Clearly, Division Two approved of Division One's analysis, and simply distinguished the case before it on the facts.

However, one case from Division Two, decided after the filing of briefs in the instant case, appears to run counter to our analysis. In *Pima County Juvenile Action No. S–2710*, 164 Ariz. 21, 790 P.2d 307 (App.1990), a father abandoned his child when the child was five weeks old. The court of appeals affirmed a finding of abandonment based on the fact that the father had not had any contact with the child for more than six months even when he was released from jail. At the time the petition for severance was filed, the father was in prison and his release would not occur before August 1992. The trial court also found that by the time the father was released the child would be five years old and would be a total stranger to his father. However, the court of appeals then stated that it was not necessary to find by clear and convincing evidence that the termination was either in the best interests of the child or that the continuation of the parental relationship would be detrimental to the child. *Id.* at 23–24, 790 P.2d at 309–10. As previously explained, we believe a finding of best interest is always necessary. Although a finding of detriment to the child is not necessary, some benefit must be gained by the child from a termination. To the extent that *Action No. S–2710* contains language contrary to our holding here, we disapprove of that decision.

In this case, although we believe the court of appeals reached the correct result, there are certain matters in the court of appeals' opinion that must be addressed. The court seems to have placed great weight on the alleged inadequacies of the caseworker's report. The court stated, "Neither the report and addendum nor McLaughlin's testimony contain any statement that it would be in the child's best interests to terminate Gary's parental rights. In the absence of such a reason, the trial court's decision to terminate Gary's parental rights was erroneous." 163 Ariz. at 21, 785 P.2d at 590. In fact, the caseworker does note on page 7 of her report that "because the natural father does not seem to want a relationship with this child, it appears that it would be in the best interests of the child for the termination to occur." Obviously, the caseworker did consider the best interests of the child. Even if the caseworker's report is subject to challenge in certain respects, "the sufficiency of her observations merely affect the weight to be given her opinion." *Appeal in Pima County Juvenile Action No. S–139*, 27 Ariz.App. 424, 427, 555 P.2d 892, 895 (1976). We find no indication that the trial court placed undue reliance on the caseworker's report.

Nonetheless, we believe the trial court's finding that termination is in the best interests of the child is not supported by the record. No evidence was presented as to how or why it would be in Bobby's best interests to lose his father. Rather, the mother contended that *just in case* she gets married in the future and *just in case* her future husband wishes to adopt Bobby, she would like to terminate the father's rights. We find this too speculative. Lynn's wish to make a testamentary nomination of her parents to serve as guardians of Bobby in the event of her own untimely death similarly fails to show any present benefit to Bobby.

The caseworker in this case noted, "when I interviewed Lynn ... she told me that if the natural father was serious about having a relationship with the child, and if he would pay child support, she would allow visitation." Furthermore, the trial court specifically found that Gary is "more mature now and is sincere in his desire to establish a father-son relationship with the child ..." Therefore, if we were to order termination, we might be denying the child a "sincere" father for a mere speculative potential benefit that might or might not materialize sometime in the future.

■ Lastly, Lynn argues that it was improper to consider the post-petition acts or motives of the father. Even if the father is now sincere, she argues, this is totally immaterial to deciding whether he abandoned his child in the past. We recognize that a prima facie case of abandonment cannot automatically be considered rebutted merely by post-petition attempts to reestablish a parental relationship. Such an automatic rule would virtually eliminate any possibility of success for a petition in a contested termination action. *Matter of Appeal in Maricopa County Juvenile Action No. JS–1363,* 115 Ariz. 600, 601, 566 P.2d 1346, 1347 (App.1977). Here, however, the judge expressly made a factual finding that the father's efforts were sincere and well-meaning. This finding was not used to negate the finding of abandonment. However, the finding of the father's intentions towards the child and the evidence upon which it is based may properly be used in weighing whether the child's best interests would be served by termination.

In addition to his sincere efforts to reestablish a relationship, the father has filed a paternity suit in order to establish visitation rights and to establish financial support obligations. There is evidence that Bobby knows his father. There is no evidence that Bobby feared or hated his father or that he has become emotionally attached to another paternal figure. We cannot hold that there is sufficient evidence to terminate when the record is entirely devoid of any explanation of what Bobby will gain or lose.

■ We further note, however, that the record on the issue of the best interests of the child might have been improved if Bobby had been appointed independent counsel. A.R.S. § 8–225(A) provides that "[i]n all proceedings conducted pursuant to [Title 8] and the Rules of Procedure for the Juvenile Court, a child has the right to be represented by counsel." *See also* Ariz.R.P.Juv.Ct. 20(a). We have held that:

> [D]ue process does not require independent counsel for children in each and every case in which they are involved. We hold today that the trial court shall appoint independent counsel, upon request of an interested party or *sua sponte,* where such counsel would contribute to promoting the child's best interest by serving an identifiable purpose such as advocating the child's position in the dispute or ensuring that the record be as complete and accurate as possible, or it shall state why such appointment is unnecessary. This standard is in accord with, and indeed advances, the concerns underlying § 8–225(E) as it ensures that independent counsel will be appointed where there are conflicts of interest such that a child's best interests are not fully explored, advocated or included in the record.

*Matter of Appeal in Yavapai County Juvenile,* 140 Ariz. 10, 16, 680 P.2d 146, 152 (1984).

The parties in this case clearly had different interests. Each spoke on his or her own behalf, but no one spoke independently on behalf of the child. In the future we strongly recommend that the court appoint independent counsel to represent the child's interest in a contested termination proceeding such as this.

## DISPOSITION

We assume the correctness of the finding of abandonment. However, there is insufficient evidence that a termination would be in the child's best interests. Therefore, the trial court's order of termination is reversed and the court of appeals' opinion is vacated.

GORDON, C.J., CAMERON and CORCORAN, JJ., and JAMES C. CARRUTH, Superior Court Judge, concur.

FELDMAN, V.C.J., recused himself and did not participate in this decision; pursuant to Ariz.Const. art. 6, § 3, JAMES C. CARRUTH, Judge, Pima County Superior Court, was designated to sit in his stead.