NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

DAVID V., *Appellant*,

*v.*

STEVE V., ANN V., R.V., *Appellees*.

No. 1 CA-JV 18-0406
FILED 4-16-2019

Appeal from the Superior Court in Navajo County
No. S0900SV201800002
The Honorable Michala M. Ruechel, Judge

**AFFIRMED**

COUNSEL

John A. Banker Attorney at Law, Taylor
By John A. Banker
*Counsel for Appellant*

Riggs Ellsworth & Porter PLC, Show Low
By Michael R. Ellsworth, Joshua G. Crandell
*Counsel for Appellees*

## MEMORANDUM DECISION

Judge Jon W. Thompson delivered the decision of the Court, in which Presiding Judge James B. Morse Jr. and Judge Peter B. Swann joined.

**T H O M P S O N**, Judge:

¶1        David V. ("father") appeals from the superior court's order terminating his parental rights to his daughter, R.V. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2        Around May 2016, when R.V. was three years old, father left her with her paternal grandparents ("grandmother" and "grandfather," collectively, "grandparents").[1] R.V.'s stay with grandparents was supposed to be only for a "[s]hort time" but father did not return for her. Some months later, father told grandparents that "he needed [R.V.] back for a welfare check" related to insurance benefits. Grandmother brought R.V. to Mesa, where father was living, and agreed to meet him at a local restaurant; he did not show up. In September, father visited R.V. for about an hour on her birthday. Three months later, grandfather stayed with R.V. in a Mesa hotel for a weekend and invited father to visit, but he did not do so. Accordingly, grandparents remained R.V.'s primary caretakers.

¶3        In February 2017, grandparents obtained custody of R.V. through the family court. Father failed to appear at the hearing. Afterwards, father did not seek to modify the custody order or initiate contact with R.V. Father also did not give R.V. any supplies or gifts and never paid child support, as the custody order required.

¶4        In January 2018, grandparents petitioned the superior court to terminate father's parental rights under the abandonment ground. In June, counselor Tiffany Sterling prepared a social study for the court; after observing and interviewing the parties, she concluded that father and R.V. had no parent-child bond. After a contested hearing in July 2018, the superior court granted grandparents's petition. Father timely appealed. We

---

[1] The record indicates that the court eventually terminated the mother's parental rights, and she is not a party to this appeal.

have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) §§ 8-235(A) (2019),[2] 12-120.21(A)(1) (2019), and -2101(A)(1) (2019).

## DISCUSSION

¶5        On appeal, father does not dispute that he abandoned R.V. Indeed, there is no dispute that father left R.V. with grandparents in May 2016, and she has been in their primary care ever since. Father also does not dispute that he has not paid any child support or that he only visited personally with R.V. once in September 2016, for an hour during her birthday. Rather, he argues that grandparents prevented him from having meaningful contact with R.V., thereby justifying his absence from her life. The record, however, does not support father's contention.

¶6        Father asserts that the February 2017 custody order left him "no legal right to resume caring for or supervising R.V." But father did not appear at the custody hearing to contest it or seek to modify it afterwards. Nothing in the custody order itself prohibited father from having contact with grandparents or R.V. Although the order required him to obtain grandparents's permission to visit with R.V., he cites no other actions by grandparents that prevented him from visiting or maintaining contact with R.V. after the order issued.

¶7        The only restriction grandparents placed on father was that he could not come directly to their house; however, grandfather testified that he had "no problem meeting [father] at the park, [or] doing something elsewhere . . . .  So, there's never been an issue where he's not welcome." Grandfather therefore was willing to arrange visits between father and R.V., but by father's own admission, he did not even try to schedule any. Father had grandparents's contact information but only called grandfather once after February 2017, asking to borrow money. He did not ask to speak with or see R.V. Father also did not provide R.V. with any support, food, clothing, or gifts while she was in grandparents's care. Moreover, during the social study, father reported that "the reason he has not had any contact with [R.V.] is because he is angry with [grandfather] about the" custody order. Thus, father has not shown how grandparents—rather than his own actions—prevented him from establishing and maintaining a relationship with R.V. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 250, ¶ 22

---

[2] We cite to the current version of any statute unless the statute was amended after the pertinent events and such amendment would affect the result of this appeal.

(2000) (A parent "must act persistently to establish the [parent-child] relationship however possible and must vigorously assert his legal rights to the extent necessary.").

¶8 Father next asserts that severance was not in R.V.'s best interests because her situation would not change after severance. However, the superior court identified specific benefits and detriments regarding severance, and reasonable evidence supports those findings.

¶9 Once the court finds a parent unfit under at least one statutory ground for termination, "the interests of the parent and child diverge," and the court proceeds to balance the unfit parent's "interest in the care and custody of his or her child . . . . against the independent and often adverse interests of the child in a safe and stable home life." *Kent K. v. Bobby M.*, 210 Ariz. 279, 286, ¶ 35 (2005). "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance *or* be harmed by the continuation of the relationship." *Maricopa Cty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). Courts "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018). Relevant factors in this determination include whether the current placement is meeting the child's needs, an adoption plan is in place, and the child is adoptable. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3-4, ¶ 12 (2016).

¶10 The superior court found that continuing the parent-child relationship would be detrimental to R.V. Relying on the social study prepared by Tiffany Sterling, the court found that:

> Ms. Sterling conducted extensive interviews of [grandparents], Father, and [R.V.]. Ms. Sterling observed the interaction between [R.V.] and [grandparents]. She also observed the interaction between [R.V.] and Father. Ms. Sterling reported "as I observed [R.V.] and [grandparents], it is clear that they exhibit a strong bond." She further noted that the grandparents modeled compassion.
>
> When Ms. Sterling conducted a visit between [father] and [R.V.] she noted that [R.V.] "did not approach [father] but stood to the side. He asked her to hug him and she complied[.]" Ms. Sterling noted that she did not observe "[]any signs of a parent/child bond[.]" . . . Ms. Sterling further reported that [it] would not be in [R.V.'s] best interest to

remove her from her grandparent's care [and] place her in the care of her father whom she does not have any parental bond with[.]

The record supports these findings.

**¶11**        Additionally, the superior court found that R.V. would benefit from severance. Ms. Sterling reported that R.V. "is happy and secure in her home with her grandparents . . . . [and] [t]hey have a bonded relationship." Grandparents both testified that they are providing for all of R.V.'s needs and wish to adopt her. Grandparents's neighbor testified that R.V. is blossoming in grandparents's care, explaining that R.V. went from being "very shy, very withdrawn, quiet" to "very outgoing, very gregarious, a lot of fun, always happy, always in a good mood." Finally, grandmother testified that in the future she would strive to maintain a bond between R.V. and her brother.

## CONCLUSION

**¶12**        For the foregoing reasons, we affirm the order terminating father's parental rights.



AMY M. WOOD • Clerk of the Court
FILED:  AA

5