NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO B.B.

No. 1 CA-JV 22-0268
FILED 4-20-2023

---

Appeal from the Superior Court in Maricopa County
No. JD39886
The Honorable Gregory Como, Judge

**AFFIRMED**

---

COUNSEL

Thomas Vierling Attorney at Law, Phoenix
By Thomas A. Vierling
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Vice Chief Judge David B. Gass delivered the decision of the court, in which Judge Brian Y. Furuya and Judge Andrew M. Jacobs joined.

---

**G A S S**, Vice Chief Judge:

¶1 B.B.'s mother appeals the superior court's order terminating her parental rights. B.B.'s father is not a party to this appeal. Mother raises two issues, arguing the superior court erred by failing to address: (1) whether a permanent guardian was available; and (2) whether appointing a permanent guardian would be in the child's best interests. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2 In September 2020, the police found mother and four-year-old B.B. living in a broken-down car during the summer heat with no air conditioning and minimal food available. When the police offered to help mother find a shelter, she refused. The Department of Child Safety (DCS) investigated and became concerned about mother's mental health based on statements she made during her interview. DCS also noted B.B. witnessed domestic violence between his mother and father. DCS took custody of B.B., and the superior court later adjudicated him dependent as to mother.

¶3 DCS provided mother with services, including a psychological evaluation, parent-aide, and therapeutic and non-therapeutic supervised visits. DCS also asked mother to self-refer for counseling with a domestic-violence component. Mother's evaluating psychologist noted she showed some anti-social personality traits but gave her a fair prognosis of being able to parent B.B. in the future and recommended she engage in cognitive-behavioral therapy.

¶4 Eventually, mother moved into a shelter, which provided her with counseling. But DCS could not review mother's counseling records because she retracted her agreement to release information. The DCS case manager, thus, could not verify whether mother progressed on specific goals, including understanding and taking responsibility for her role in B.B.'s past trauma and her involvement in domestic violence. Instead, mother's counselor provided a few short letters confirming mother consistently attended sessions for about a year and used dialectical-behavioral strategies to work on her anxiety, past trauma, shame, personal empowerment, and coping skills.

¶5 Mother's counseling ended after she had to leave the shelter for failing to follow its policies. Though the DCS case manager offered to help mother enroll in state-sponsored insurance and self-refer to a new counselor, mother never pursued that option.

¶6 Meanwhile, B.B. thrived with his foster family but displayed extremely disruptive and aggressive behaviors in school. His foster family

secured behavioral-health services for him, and B.B. was later diagnosed with post-traumatic stress disorder and attention-deficit hyperactivity disorder. DCS referred him for trauma therapy and a psychiatric evaluation.

¶7            Mother attended visits with B.B., but the supervisor noted she disciplined him inappropriately, engaged in power struggles with him, and placed unreasonable expectations on him—leading to frustration between mother and B.B. As a result, mother and B.B. began therapeutic visits in January 2021. With the therapist's help, mother improved her ability to respond to B.B.'s needs and successfully completed the referral.

¶8            Even so, B.B.'s visits with mother did not go well. Within a few months, B.B. refused to visit mother, and DCS assigned a parent-aide with little success. B.B. attended a few visits but became very dysregulated during and after and had nightmares. For six months, he refused to visit mother. At that point, DCS recommended mother attend virtual visits with B.B. and his father. Though B.B. was receptive to virtual visits, mother did not attend them consistently. By trial, mother had not visited B.B. for eight months.

¶9            DCS also referred mother for an updated psychological evaluation and a bonding and best-interests assessment. She completed none. DCS ultimately moved to terminate mother's parental rights under the 15-month out-of-home placement ground. *See* A.R.S. § 8-533.B.8.c. After an adjudication hearing, the superior court terminated mother's parental rights.

¶10           This court has jurisdiction over mother's timely appeal under section VI, article 9, of the Arizona Constitution, and A.R.S. § 8-235.A.

## ANALYSIS

I.     **The superior court did not fundamentally err when it found DCS proved the 15-month out-of-home placement ground.**

¶11           Mother argues the superior court violated her due process rights because it did not require DCS prove a guardianship-case plan was not feasible.

¶12           A parent has a fundamental right "to direct the upbringing, education, health care and mental health of their children," and restricts the state from "infring[ing] on these rights without demonstrating that the compelling governmental interests as applied to the child involved is of the

highest order, is narrowly tailored and is not otherwise served by a less restrictive means." A.R.S. § 1-601. Mother argues that statutory provision requires DCS prove no potential placement was willing to serve as a permanent guardian and address a permanent-guardianship case plan if one was available. Mother argues the superior court must then make findings about whether DCS met its burden.

**¶13**     This court generally reviews constitutional and statutory interpretation issues *de novo. Brenda D. v. Dep't of Child Safety*, 243 Ariz. 437, 442 ¶ 15 (2018). But when a parent fails to raise such claims in the superior court, this court reviews for fundamental error. *Id.* at 447 ¶ 37. To prevail in a claim of fundamental error, the parent must show prejudice. *Brenda D.*, 243 Ariz. at 447–48 ¶ 38. Because mother did not raise this issue before the superior court, this court reviews her claim for fundamental error. *See id.* at 447 ¶ 37.

**¶14**     Even if § 1-601 applies to parental termination proceedings, mother failed to allege, let alone show, prejudice. *See id.* at 447–48 ¶ 38. At most, mother says, "a guardianship would be less restrictive as it would not terminate a parent's parental rights." This statement falls short because mother "cannot merely 'rely upon speculation'" and "must show that a reasonable [factfinder] could have reached a different result." *Id.* at 430 ¶ 38 (citation omitted). Mother, thus, has not shown fundamental error.

**II.    The superior court did not err when it found DCS proved termination was in the child's best interests.**

**¶15**     Mother argues the superior court cannot find termination is in the child's best interests under a totality of the circumstances for a 15-month out-of-home placement ground unless it considers a permanent-guardianship case plan.

**¶16**     The superior court "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148 ¶ 1 (2018). Once the superior court finds a parent unfit under at least one statutory ground for termination, "the interests of the parent and child diverge," and the court goes on to balance the unfit parent's "interest in the care and custody of his or her child . . . against the independent and often adverse interests of the child in a safe and stable home life." *Kent K. v. Bobby M.*, 210 Ariz. 279, 286 ¶ 35 (2005). "[A] determination of the child's best interest[s] must include a finding as to how the child would benefit from a severance or be harmed by the

continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). The totality of the circumstances may include a parent's rehabilitation efforts and the negative effect a statutory ground may have on a child. *See Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 478 ¶ 31 (2022).

¶17 Termination is in a child's best interests if the superior court finds a child would benefit from termination based on an existing adoption plan or if the child is adoptable. *Alma S.*, 245 Ariz. at 150–51 ¶¶ 13–14. The same is true if the child "would benefit psychologically from the stability an adoption would provide." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352 (App. 1994). Conversely, the superior court may find continuation of the parent-child relationship would harm a child if "there is clear and convincing evidence of parental unfitness which has not been remedied notwithstanding the provision of services by [DCS] and which detrimentally affects the child's well-being." *Pima Cnty. Juv. Action No. S-2460*, 162 Ariz. 156, 158 (App. 1989).

¶18 This court accepts the superior court's "findings of fact unless no reasonable evidence supports those findings, and . . . will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002). This court does not reweigh the evidence but "look[s] only to determine if there is evidence to sustain the court's ruling." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004).

¶19 On this record, we find no error. True, the superior court did not consider or make findings about a permanent-guardian case plan as part of its best-interests inquiry. But neither DCS nor mother filed a guardianship petition, and no evidence suggested any potential placement was willing to be B.B.'s permanent guardian. *Cf. Timothy B.*, 252 Ariz. at 477 ¶ 28 (under the length-of-sentence ground, the superior court acknowledged maternal aunt was "willing to serve as a legal permanent guardian" so it should have considered whether a guardianship could provide the child with a normal home while father was imprisoned). The superior court must "make specific findings of fact in support of the termination of parental rights" supported by the record. *See* Ariz. R.P. Juv. Ct. 353(h)(2)(A). Without a guardianship petition or some indicia in the record raising the issue, the superior court need not make findings about a permanent-guardian case plan. *See generally* Ariz. R.P. Juv. Ct. 353(h).

¶20 Additionally, to approve a permanent guardian, the superior court would have had to find the likelihood "the child would be adopted is

remote or termination of parental rights would not be in the child's best interests," which the record does not support. A.R.S. § 8-871.A.4; *cf.* A.R.S. § 8-533.B (expressing no inverse requirement for the superior court to consider a guardianship before terminating parental rights).

**¶21** Here, the superior court made the required findings. It found B.B. was adoptable because he had two potential adoptive placements, including his foster family and an out-of-state relative. The superior court found he would benefit from adoption because both families could meet his basic and special needs. The superior court went further and found maintaining mother's parental relationship with B.B. would be detrimental to him because he "would continue to linger in the foster care system with no foreseeable prospect for reunification" as mother was unable to care for him currently and for the foreseeable future. Reasonable evidence supports these findings. *See Jesus M.*, 203 Ariz. at 280 ¶ 4.

**¶22** Mother argues the superior court failed to give sufficient weight to her reunification efforts. We decline mother's invitation to reweigh the evidence and consider only whether evidence supports the superior court's ruling. *See Mary Lou C.* 207 Ariz. at 47 ¶ 8. True, the superior court expressly recognized mother "initially show[ed] some improvement," but it also noted her overall participation in services was "mixed." The record supports the superior court's findings. Though mother initially participated, she refused or failed to complete an updated psychological evaluation, a parent-child assessment, or attend virtual visits with B.B. Mother did not ensure DCS had access to her counseling records and prevented the DCS case manager from fully assessing her progress and ability to parent a young, special-needs child. And mother refused to testify about her current living situation or income, from which the superior court appropriately drew a negative inference. *See Montoya v. Superior Court In and For Cnty. of Maricopa*, 173 Ariz. 129, 131 (App. 1992) ("[T]he trial judge may draw a negative inference from the [parent's] invocation of the Fifth Amendment."). On this record, we find no error.

**CONCLUSION**

¶23      We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA