IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

―――――――――――――――――

IN RE TERMINATION OF PARENTAL RIGHTS AS TO M.L.

No. 1 CA-JV 25-0008
FILED 11-19-2025

―――――――――――――――――

Appeal from the Juvenile Court in Coconino County
No.  S0300SV202300029
The Honorable Angela R. Kircher, Judge *Pro Tempore*

**AFFIRMED**

―――――――――――――――――

COUNSEL

Harris & Winger PC, Flagstaff
By Chad Joshua Winger
*Counsel for Appellant*

Krystal S., Flagstaff
*Appellee*

Coconino County Public Defender's Office, Flagstaff
By Sandra L. J. Diehl
*Counsel for Appellee Child*

---

**OPINION**

---

Judge Michael S. Catlett delivered the opinion of the Court, in which Presiding Judge D. Steven Williams and Judge Andrew M. Jacobs joined.

---

**C A T L E T T**, Judge:

**¶1**         Krystal S. ("Mother") petitioned to terminate the parental rights of Jorden L. ("Father") to their child, M.L. ("Child"). The juvenile court found "Child is adoptable," "Mother's [fiancée] wishes to adopt [C]hild," "Child would be at risk of harm if she were to be in Father's care," and "Father cannot provide a stable home for Child." The court found Father abandoned Child and termination is in Child's best interests, so it terminated Father's rights. *See* A.R.S. §§ 8-533(B)(1), 8-537(B). On appeal, Father challenges only the court's best interests finding. We affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**         Before Child's birth in 2018, Mother and Father lived together. After Child's birth, Father was in her life for a time, but his involvement waned. In 2019, Mother had Father removed from their home after he committed domestic violence. Mother also obtained an order of protection restricting Father's contact to emails about co-parenting.

**¶3**         Mother twice emailed Father about an online app to help with parenting time. She also emailed Father to see about visiting Child on Father's Day 2019. Father never used the app; nor did he see Child.

**¶4**         Father emailed Mother in April 2020 asking to see Child, but Mother refused because of COVID-19. But Mother did email Father updates about Child. When Father was silent, those updates stopped.

**¶5**         Three years passed with no contact from Father. So, in July 2023, Mother petitioned to terminate Father's parental rights, alleging abandonment. *See* A.R.S. § 8-533(B)(1).

**¶6**         The juvenile court held a hearing in February 2024. By then, five years had passed without Father seeing Child. During the hearing, Mother testified that termination was in Child's best interests because Child

does not know Father, he has not participated in Child's life, and having a relationship with Father would be unhealthy for Child. Mother explained she and her fiancée ("Fiancée") provide Child with a healthy, stable environment and Child "is loved by two parents already," meaning Mother and Fiancée. Mother planned to marry Fiancée on November 3, 2024, and they had a venue in mind.

¶7        Fiancée testified that she will adopt Child after marrying Mother. Fiancée said she discussed adoption with Child, and Child wants it to occur. Fiancée and Child love each other, and Child calls Fiancée "Mom." Fiancée believed termination was in Child's best interests; plus, she worried Child's life would be "destabilized" if Father's parental rights remain and something happens to Mother.

¶8        Father testified he could provide a safe household for Child but was living in a studio apartment inappropriate for Child. Father said he had not abandoned Child because he paid "80 percent" of child support and had "the potential to have a relationship with [Child]." Father believed termination was not in Child's best interests because he came from a divorced home and Child should have a father. When asked if he provided anything but money to Child, Father said he did not have the opportunity, but he claimed he tried to contact Mother.

¶9        The juvenile court found abandonment and that termination was in Child's best interests. *See* A.R.S. § 8-533(B)(1). It signed a minute entry terminating Father's rights but did not make findings. Father appealed. We remanded for findings. The court issued a new order terminating Father's rights. We also found that order lacking and vacated it for additional findings. *In re M.L.*, 2024 WL 4357440, at *3–4 ¶¶ 20–26 (Ariz. App. Oct. 1, 2024) (mem. decision).

¶10        On remand, the juvenile court found as follows:

> 4.        The last time Father had any contact with Child was when she was approximately eight months old.
> . . . .
> 11.        Child is currently in a happy, stable home with two parents, namely, Mother and her partner.
> 12.        Child's home functions as a normal family home, in which Child's needs are met and where she is loved and nurtured.
> 13.        Child refers to Mother's partner as "Mom" and has a strong, stable bond with Mother's partner.

3

14.     Child is adoptable.

15.     Mother's partner wishes to adopt child.

. . . .

17.     Child has not had a relationship with Father since she last saw him in 2019.

18.     Father has a history of substance abuse and physical aggression for which no evidence was presented indicating he has alleviated these concerns.

19.     Child would be at risk of harm if she were to be in Father's care, given Father's unaddressed aggression and substance abuse.

20.     Father cannot provide a stable home for Child[.]

¶11     Father moved for relief from judgment, which the court denied.  Father timely appealed; we have jurisdiction.  A.R.S. § 8-235(A).

**DISCUSSION**

¶12     Father admits abandonment.  He challenges only whether termination was in Child's best interests.

¶13     Termination is in a child's best interests if the child (1) will benefit from termination or (2) be harmed without it.  *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶ 13 (2018).  A parent and child's interests diverge if a statutory ground for termination exists.  *Id.* ¶ 12.  In determining best interests, the court must consider all the circumstances.  *Id.* at 150–51 ¶ 13.  The court may find a benefit from termination if there is an adoption plan, or if the child is "adoptable."  *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3–4 ¶ 12 (2016).  We affirm a best interests finding unless no reasonable factfinder could conclude that adequate evidence supports that finding.  *See Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478–79 ¶ 31 (2023).

**I.**

¶14     Child was adoptable and adoption was not too speculative.

**A.**

¶15     Father argues Mother and Fiancée were unmarried at termination, so Child was not adoptable.

¶16     Adoptability focuses on the child at issue.  It does not turn *narrowly* on whether a particular adult can adopt a particular child.  Nor

does it turn *broadly* on whether "someone, somewhere, would be willing to adopt the child[.]" *Titus S. v. Dep't of Child Safety*, 244 Ariz. 365, 370 ¶ 19 (App. 2018). Instead, adoptability turns on whether it is *more probable than not* a child will be adopted by someone upon termination. *See Demetrius L.*, 239 Ariz. at 3–4 ¶ 12; *Pima Cnty. Juv. Action No. S-2460*, 162 Ariz. 156, 158 (App. 1989) (explaining "the improbability of adoption, absent other factors, weighs against" termination); *Titus S.*, 244 Ariz. at 371 ¶ 22 (reversing a termination order because adoption was "more improbable than likely"). For example, in *Titus S.*, we concluded children were not adoptable because of their "ages and their apparent resolve" to refuse consent. 244 Ariz. at 371 ¶ 24; *see also* A.R.S. § 8-106(A)(3) (a child who is twelve or older must consent to adoption).

**¶17**       Child was adoptable—it was more probable than not someone would adopt her. *See Titus S.*, 244 Ariz. at 370 ¶ 19. This is best evidenced by Fiancée's desire to adopt Child.

**B.**

**¶18**       Father next argues adoption was too speculative because Fiancée could not adopt Child until she married Mother, which did not occur before termination. *See Pima Cnty. Juv. Adoption Action No. B-13795*, 176 Ariz. 210, 211 (App. 1993) (A.R.S. § 8-117 contains only a stepparent exception to the child adoption statute).

**¶19**       When termination occurred in February 2024, Mother and Child had known Fiancée for almost three years, and Mother had been in a romantic relationship with Fiancée for over two years (since December 2021). Fiancée had lived with Mother and Child for almost eighteen months (since September 2022), and Mother and Fiancée had been engaged for a year (since February 2023). Mother and Fiancée picked a wedding date (November 3, 2024) and had a venue in mind. Once married, Fiancée planned to adopt Child. Fiancée testified that Child wants Fiancée to adopt her, and after the wedding, "the goal is to initiate paperwork as soon as we can to adopt."

**¶20**       We disagree with Father's view that adoption was relevant only if Mother and Fiancée had married before termination. The juvenile court often makes predictive judgments about future events. In fact, several statutory grounds for termination require it to do so. *See, e.g.*, A.R.S. §§ 8-533(B)(3) (the court must find that "there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period"); 8-533(B)(4) (the court must find that "the sentence of that parent is of such

length that the child will be deprived of a normal home for a period of years"); 8-533(B)(8)(c) (the court must find that "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future"). We treat a court's predictions about future events no different than other factual findings—we ask whether reasonable evidence and inferences support them. *See Brionna J.*, 255 Ariz. at 479 ¶¶ 35-36 (reviewing findings supporting termination under § 8-533(B)(8)(c) for "reasonable evidence"); *In re W.Z.*, 2025 WL 1589291 *4 ¶¶ 23–25 (Ariz. App. June 5, 2025) (mem. decision) (reasonable evidence supported a finding that mother was substantially unlikely to parent soon). And that standard—reasonable evidence—applies to a court's prediction about how future events will impact a child's best interests.

**¶21** The evidence here was sufficient to find that Mother and Fiancée would soon marry. And after termination and marriage, it would be legally possible for Fiancée to adopt Child. *See* A.R.S. § 8-117(C).

**¶22** We do not suggest the court *had* to find that marriage and adoption were sufficiently likely. It is not for us to decide how best to view the evidence. Our appellate role is limited—we review the record and ask, when viewed favorably to affirming, does reasonable evidence support the court's findings? *Brionna J.*, 255 Ariz. at 478–79 ¶¶ 30, 32. We conclude reasonable evidence supports that Mother and Fiancée would soon wed, thereby allowing Fiancée to adopt Child.

## II.

**¶23** Reasonable evidence also supports the juvenile court's finding that "Child would be at risk of harm if she were to be in Father's care" and "Father cannot provide a stable home for Child."

**¶24** Multiple witnesses testified Father engaged in past domestic violence and substance abuse. Father admitted he failed to maintain a stable relationship with a child from a prior relationship. And Father was unemployed and lived in a studio apartment he agreed was inappropriate for Child.

**¶25** On these points, there was conflicting evidence. Father testified he attended court-ordered anger management and drug counseling, and he individually pursued counseling. Father regretted being estranged from his older child and said he "would like to be in [Child's] life to maybe prevent any of these same issues of not knowing her father." Father explained his employment difficulties stemmed from a

work-related injury and his criminal background. And Father maintained he would "have a home suitable for [Child]" before seeking parenting time.

¶26 The juvenile court weighed this conflicting evidence. We cannot now reweigh it. *Id.* at 479 ¶ 32 (appellate courts cannot "reweigh[] the evidence presented at the termination hearing"). Reasonable evidence supports the court's findings about the risk to Child in Father's care and his inability to provide a stable home. *See id.* ¶ 36.

## III.

¶27 The record supports that termination was in Child's best interests.

## A.

¶28 Father says our supreme court "has distinguished between 'tentative' prospective adoptions and those that are 'more certain.'" Father is correct. But adoption here was "more certain," and it supported the court's best interests finding.

¶29 In *Jose M. v. Eleanor J.*, the juvenile court found that a father abandoned his child and termination was in the child's best interests. 234 Ariz. 13, 15 ¶¶ 3, 10 (App. 2014). On appeal, we observed that the "only stated basis" for the best interests finding was that termination "would allow [the child] to be adopted by Mother's fiancé." *Id.* ¶ 23. We acknowledged "that an adoptive plan may" support termination in a state-initiated proceeding "in which the child was in foster care." *Id.* at 17–18 ¶ 23. We contrasted a foster-care situation with a private termination where a child lives with a natural parent and her fiancé. *Id.* In that latter situation, "there is no suggestion that any day-to-day aspect of the [child's] current living arrangement will change[.]" *Id.* And, therefore, the mother's "stated intent to marry fiancé on some undetermined future date, and fiancé's interest in adopting [the child]," would not sufficiently increase the child's "stability and permanency." *Id.*

¶30 Two years later, our supreme court largely disavowed *Jose M.*'s best interests analysis. *See Demetrius L.*, 239 Ariz. at 5 ¶ 18. In *Demetrius L.*, our supreme court concluded that sufficient evidence supported the juvenile court's best interests finding, and we had "erred in concluding otherwise based on *Jose M.*" *Id.* at 3 ¶ 9. The court explained that, in "state-initiated [termination] actions," best interests may be met if a petitioner proves "a current adoptive plan exists for the child, or even that the child is adoptable." *Id.* at 3–4 ¶ 12 (cleaned up). The court said the same

is true in private terminations. *Id.* at 4 ¶ 13. Ultimately, the court "disavow[ed] *Jose M.*'s reasoning with respect to (1) its distinguishing the significance of adoption in private versus state-initiated severance cases, and (2) its assessing the benefits of adoption solely in terms of whether the child's 'day-to-day' living arrangement will change." *Id.* at 5 ¶ 18.

¶31 The supreme court also distinguished the situation in *Demetrius L.* from that in *Jose M.* and *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1 (1990) ("*JS-500274*"). *See* 239 Ariz. at 5 ¶ 19. The court explained that adoption in *Jose M.* "*arguably* was uncertain because the prospective adoption was tentative." *Id.* (emphasis added). And in *JS-500274*, "the mother contended that *just in case* she gets married in the future and *just in case* her future husband wishes to adopt [the child], she would like to terminate the father's rights." 167 Ariz. at 7. That was "too speculative." *Id.*

¶32 In *Demetrius L.*, termination "would not merely position [the child] as a possible adoptee waiting and hoping for a better, willing provider to come along." 239 Ariz. at 5–6 ¶ 20. Instead, the stepfather married the mother, "ha[d] financially provided for [the child] for about half of [his] life, and fulfills the psychological role of a parent." *Id.* at 6 ¶ 20. The stepfather knew the child for "about six years," had a "close and loving relationship" with him, and wanted to adopt. 239 Ariz. at 2 ¶ 5. So adoption was more "than a mere possibility." *Id.* at 5 ¶ 19.

**B.**

¶33 Here, termination was in Child's best interests because Mother and Fiancée had concrete plans for Fiancée to adopt Child. *See id.* at 3–4 ¶ 12 (best interests can be met with an adoption plan *or* if child is adoptable). Terminating Father's rights would not make Child "a possible adoptee waiting and hoping for a better, willing provider to come along[.]" *Id.* at 5–6 ¶ 20. Instead, termination would make it "legally *possible* and likely" that Fiancée would adopt Child. *Id.* at 4 ¶ 12 (emphasis added).

¶34 True, Fiancée could not adopt without taking additional steps, including marrying Mother. *See* A.R.S. § 8-117(C). But prospective adoptions are always contingent—no adoptive parent can complete every step to adopt a child before termination. *See Titus S.*, 244 Ariz. at 371 ¶ 23 ("[T]he benefit of a prospective adoption, for purposes of a best-interests inquiry, cannot depend on a 'guarantee' that the adoption will occur[.]"). So we require no more than an adoption plan, which is just that: a *plan*. *See,*

*e.g.*, *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 50 ¶¶ 19–21 (App. 2004) (the potential for adoption may support a best interests finding).

¶35        Child was five years old at termination.  Despite Mother trying to involve Father, he had no contact with Child after she was eighteen months old.  Mother testified Child would not recognize Father, and Child never asked about him.  So Father and Child had no relationship to maintain.  *See Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 478 ¶ 31 (2022) (the juvenile court must consider father's "past and ongoing efforts to parent" child and its potential impact in its best interests analysis).

¶36        On the other hand, Fiancée knew Child for most of Child's life, fulfilled a parental role, maintained a loving relationship with Child, and planned to marry Mother and adopt Child.  Mother did not seek termination just in case she meets someone she wants to marry.  Mother provided Child with a stable household with someone Mother and Child both knew and loved, and Mother had concrete plans for that individual to adopt Child.  Thus, adoption by Fiancée was "much more certain than a mere possibility," and it was not "too speculative." *Demetrius L.*, 239 Ariz. at 5 ¶ 19; *JS-500274*, 167 Ariz. at 7; *cf. Jose M.*, 234 Ariz. at 18 ¶ 23 ("Mother's *stated intent* to marry fiancé on some *undetermined future date*, and fiancé's *interest* in adopting [the child], *without more*," could not justify termination. (emphasis added)); *In re J.C.*, 2023 WL 6475445, *2 ¶ 8 (Ariz. App. Oct. 5, 2023) (mem. decision) (denying termination when "although [the mother] confirmed that marrying [her boyfriend] is something she would 'want to do in the future,' she did not testify as to any specific plan to do so").

¶37        Allowing Fiancée to adopt Child will "add permanency and stability to the de-facto [mother-daughter] relationship" they share. *Demetrius L.*, 239 Ariz. at 5 ¶ 20.  It will make Fiancée legally and financially responsible for Child.  *Id.* at 6 ¶ 21.  And if something happens to Mother, it will ensure Child remains with an adult whom she considers a parent, which is important given the court's findings about the risks to Child with Father and his inability to provide a stable home.  *Id.*; *Alma S.*, 245 Ariz. at 150 ¶ 12 ("The child's interest in stability and security must be the court's primary concern." (cleaned up)); *supra* ¶¶ 23-26.  Child's prospective adoption was sufficient for the court to conclude that termination was in Child's best interests.  *Demetrius L.*, 239 Ariz. at 5 ¶ 16.

**IV.**

¶38        Father argues the juvenile court erred in finding that "Child is currently in a happy, stable home with two parents, namely, Mother and

her partner." Father argues the court erred because Arizona rules and statutes define a "parent" as a biological, adoptive, or legal parent, and not someone in Fiancée's position. But the juvenile court did not say Fiancée is a "parent" in the legal sense. Instead, it used "parent" colloquially—Child views Fiancée as a parent and Fiancée acts like one. This is no different than our supreme court's comment in *Demetrius L.* that the stepfather "fulfill[ed] the psychological role of a parent" and adoption would further "the de-facto father-son relationship that Stepfather and [the child] already have." *Id.* at 5–6 ¶ 20.

## V.

**¶39** Father also suggests the juvenile court erred by relying on facts supporting abandonment when determining best interests. To be sure, a court cannot "assume that a child will benefit from termination simply because [s]he has been abandoned." *JS-500274*, 167 Ariz. at 5–6. "Rather, petitioner must prove an affirmative benefit to the child resulting from termination." *Id.* at 6.

**¶40** But a court—juvenile or appellate—need not blind itself to all evidence supporting abandonment. Courts should not ignore facts or evidence supporting best interests just because they also support abandonment—facts or evidence may support both. *See Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 231 ¶ 32 (2020) (once abuse was established, children living in "a home environment free of a heightened risk of abuse" also supported a best interests finding); *Alma S.*, 245 Ariz. at 148 ¶ 1 (when deciding best interests, courts must consider all the circumstances).

**¶41** When considering best interests, courts ask whether "termination or *maintenance* of the parent-child relationship" best serves the child's interests. *Timothy B.*, 252 Ariz. at 478 ¶ 31 (emphasis added). In abandonment cases, parents sometimes argue termination is not in a child's best interests because they could have a future relationship with the child. *See, e.g., In re C.R.*, 256 Ariz. 170, 176 ¶ 26 (App. 2023); *In re C.E.*, ___ Ariz. ___, ___ ¶ 17–18, 573 P.3d 101, 104–05 (App. 2025). But a juvenile court may not base its ruling on sheer "speculation, however plausible, regarding the possibility of a future relationship." *In re C.E.*, 573 P.3d at 104–05, ¶ 17. Instead, the court must consider evidence about the current nature of the parent-child relationship, including any steps a parent has taken to re-establish a parent-child relationship or to remove roadblocks preventing such a relationship. *See In re C.R.*, 256 Ariz. at 176 ¶ 27. Often, facts relevant to that consideration will also bear upon abandonment.

¶42	The juvenile court here did not assume Child would benefit from termination merely because Father abandoned her—and neither do we. Instead, Child has no relationship with Father, and she will reap stability and security from Fiancée's likely adoption. That was sufficient to find termination was in Child's best interests.

## VI.

¶43	Finally, Father argues the juvenile court violated his due process rights by entering findings he claims were "outside" what Mother pled in her petition.

¶44	Mother's petition complied with A.R.S. § 8-534(A)—it alleged grounds for termination and best interests. Mother later disclosed she would testify about "Father's criminal background, including a charge for domestic violence," "Father being in prison for an arrest related to drugs," and "Father['s] threat[s] to kill [her], resulting in Mother having to obtain a protective order against Father." Mother also disclosed Fiancée would testify "about her close and loving relationship with [Child] and her intention to adopt [Child.]" During the hearing, the court gave Father ample time to cross-examine Mother and her witnesses and to present his case-in-chief. There was no due process violation.

## CONCLUSION

¶45	We affirm termination. Father also appeals the denial of his motion for relief from judgment. Because we reject Father's appellate arguments (which are identical to those in his motion for relief), we also affirm the order denying that motion.

