IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO C.R. and A.R.

No. 1 CA-JV 23-0041
FILED 9-19-2023

Appeal from the Superior Court in Maricopa County
No. JS519906
The Honorable Sigmund G. Popko, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Thomas A. Vierling Attorney at Law, Phoenix
By Thomas A. Vierling
*Counsel for Appellant Father*

Stuart & Blackwell PLLC, Chandler
By Cory A. Stuart
*Counsel for Appellee Mother*

### OPINION

Judge Daniel J. Kiley delivered the opinion of the Court, in which Vice Chief Judge Randall M. Howe and Judge Jennifer M. Perkins joined.

**K I L E Y**, Judge:

¶1        James R. ("Father") appeals the juvenile court's order terminating his parental rights to his children, C.R. and A.R. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2        Father and Laura R. ("Mother"), who were married in 2013 and divorced in 2020, are the biological parents of C.R., born in 2015, and A.R., born in 2017.

¶3        Viewed in the requisite "light most favorable to sustaining the juvenile court's order," *In re O.M.*, 254 Ariz. 543, 544, ¶ 3 (App. 2023), the evidence shows that Father used illegal drugs "off and on" throughout the marriage. When under the influence of illegal drugs, Father exhibited "paranoia," expressing to Mother fear that "people were hiding" in the attic of their home or "under [the] mattress" of their bed. He could also become physically abusive, and choked Mother on "several" occasions while under the influence.

¶4        In March 2019, Mother filed a petition for an order of protection against Father, alleging, *inter alia*, that Father "is currently using cocaine or crystal," "is having delusions and hallucinations," carries "a kitchen knife throughout the house," and threatens that "he will blow up [her] car" if she "leave[s] him." The superior court issued the order of protection (the "First OOP") directing Father to have "no contact" with Mother, C.R., or A.R. "except through attorneys, legal process, [or] court hearings" and excluding Father from the family residence. Father did not contest the First OOP. Although Father later had limited contact with the children by telephone, he never saw them again.

¶5        In April 2019, Mother filed a petition for dissolution of marriage. In the dissolution decree entered in February 2020, the superior court found that "Father is 'Seriously Mentally Ill' by his own admission and is presumed to be abusing drugs since he failed to submit [to] court-ordered drug testing." The court further found that Father "has engaged in

acts of domestic violence against" Mother. The court awarded Mother sole legal decision-making authority for the children and granted Father no parenting time, finding that "an award of parenting time" to Father "is not in the best interest of the children at this time." The court held, however, that Father could move to modify the decree to obtain parenting time once he took the following actions to address his mental health and substance abuse issues:

> Father must submit two clean hair follicle tests evidencing no less than 6 months sobriety, attend a domestic violation evaluation at Sage Counseling, Inc., comply with the recommendations in that evaluation and submit a record from a mental health professional establishing mental stability.

Father never submitted evidence that he complied with any of these conditions, nor did he ever seek to modify the decree to obtain parenting time with the children.

¶6        In March 2020, police officers arrived at Mother's home to conduct a welfare check after Father made a baseless report that Mother "killed the kids." That same month, Father was arrested and jailed for burglary. While in custody over the ensuing months, he had telephone contact with the children "a handful of times." Father was subsequently convicted and sentenced to prison in September 2020.

¶7        In October 2020, Mother petitioned to terminate Father's parental rights on grounds of abandonment, neglect, incapacity, and felony conviction under A.R.S. §§ 8-533(B)(1)-(4).

¶8        The following month, Father sent Mother's employer an unsigned letter purportedly written by the parent of an unidentified 16-year-old boy whom Mother was allegedly "sleeping with." Claiming to have "sexual photos & videos of the illegal sexual activity," the letter's anonymous author threatened to sue Mother's employer unless the employer fired her. The letter also accused Mother, a licensed pharmacist, of "stealing a lot of narcotic pills" and "re-selling them to underage boys."

¶9        Father also sent letters to Mother from jail in which he called her "sick," a "whore," and a "bitch." Accusing her of "stealing narcotics" from her employer, Father warned, "Your gonna be going to jail soon [*sic*]." On one occasion he sent Mother a postcard demanding that she bring the children to jail to visit him, warning,

> I ain't playen!! You either are gona bring my kids to come see me or my parents are gona take you pharmacy license away bitch!!! [*sic*]

¶10        In January 2021, almost a year after the First OOP expired, Mother applied for and obtained a second order of protection (the "Second OOP"), which prohibited Father from contacting Mother but made no reference to the children. Father never contested the Second OOP. Father was released from prison in November 2021. In January 2022, Mother applied for and obtained a third order of protection (the "Third OOP") which, like the First OOP, barred Father from contacting Mother or the children "except through attorneys, legal process, [or] court hearings." Father never contested the Third OOP.

¶11        After a four-day trial throughout September and November 2022, the court terminated Father's parental rights as to C.R. and A.R. on abandonment grounds. Father timely appealed. We have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

¶12        A parent's right to custody and control of his or her child, though fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). The parental relationship may be terminated if the juvenile court finds, by clear and convincing evidence, at least one statutory ground for termination under A.R.S. § 8-533(B) and further finds, by a preponderance of the evidence, that termination is in the child's best interest. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 13 (2022). We view evidence in the light most favorable to sustaining the juvenile court's findings, *see Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008), and we will affirm an order terminating parental rights absent an abuse of discretion, *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

### A.        Statutory Grounds for Termination

¶13        Abandonment of a child occurs when a parent fails to "provide reasonable support and to maintain regular contact with the child, including providing normal supervision." A.R.S. § 8-531(1). To establish abandonment, the evidence must show that the parent has made only "minimal efforts to support and communicate with the child." *Id.* "Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment." *Id.*

¶14　　　　Father challenges the juvenile court's finding of abandonment, arguing that "[a]lthough it has been in excess of six months since [he] had contact with the children, it is with just cause." He explains that Mother "block[ed] him from communicating" with the children by "obtain[ing] orders of protection" and complains that she "refused to bring the children to the jail or prison for visits with him." Because "Mother actively sought to prevent contact between Father and the children on multiple fronts," Father contends, his lack of contact with the children does not support a finding of abandonment.

¶15　　　　The well-established principle that "a parent who has persistently and substantially restricted the other parent's interaction with their child" may not then rely on the other parent's "limited involvement with the child" to "prove abandonment," *Calvin B. v. Brittany B.*, 232 Ariz. 292, 293, ¶ 1 (App. 2013), applies only if the parent *wrongfully* restricts the other parent's access to the child. In *Calvin B.*, for example, this Court reversed a finding that the father "abandoned" his children because the mother had "violated" the parenting time provisions of their dissolution decree "by refusing to allow" him to exercise his court-ordered parenting time. *Calvin B.*, 232 Ariz. at 294, 297, ¶¶ 2, 24; *accord Anthony O. v. Nora R.*, 2 CA-JV 2022-0016, 2022 WL 2348526, at *4, ¶ 14 (Ariz. App. June 29, 2022) (mem. decision) (affirming termination of incarcerated father's rights to his children in part because, "[e]ven crediting" father's allegation that mother did not inform him of her new address and phone number after she and the children moved, "nothing in the record supports an allegation that she undertook those action[s] to evade him").

¶16　　　　Here, by contrast, no evidence shows that Mother ever blocked Father's contact with the children in violation of any court order. On the contrary, the parties' dissolution decree expressly denied Father any parenting time. Although the decree authorized Father to seek an award of parenting time after completing specified steps to address his substance abuse and mental health issues, he did not complete those steps, nor did he otherwise seek to modify the decree. The record supports the juvenile court's determination that "Father's own failure to comply with the family court decree," rather than anything Mother did or didn't do, "is the reason Father does not have a parent-child relationship" with the children. *See Christopher M. v. Aubrey R.*, 2 CA-JV 2021-0122, 2022 WL 95468, at *1-2, ¶¶ 1, 6, 13 (Ariz. App. Jan. 10, 2022) (mem. decision) (affirming termination of father's rights on abandonment grounds in part because father did not exercise his court-ordered supervised parenting time; rejecting father's argument that he exercised no parenting time because he objected to the

supervision requirement, the court noted that father never sought "to modify the parenting-time order" to remove the supervision requirement).

¶17 Contrary to Father's allegation, nothing suggests that Mother obtained the orders of protection against him wrongfully. Mother sought and obtained the First OOP during the parties' marriage due to Father's threats, acts of violence, and erratic behavior, and she obtained the Second OOP and the Third OOP after Father sent harassing letters from jail to Mother and her employer. *See Michael M. v. Deborah M.*, 2 CA-JV 2017-0136, 2018 WL 259208, at *3, ¶ 10 (Ariz. App. Jan. 2, 2018) (mem. decision) (affirming finding of abandonment and rejecting father's argument that mother "impeded his ability to contact" the parties' child by obtaining order of protection because father's "own conduct . . . made it necessary for the court to impose the very safety measures that restricted his contact with his daughter").

¶18 And if Father believed that Mother obtained the orders of protection wrongfully, he could have requested a hearing to contest them. *See* Ariz. R. Protective Ord. P. 38. He did not. Alternatively, Father could have sought to modify the orders of protection to remove the prohibition on contact with the children. Again, he did not, and his inaction supports the finding of abandonment. *See Michael M.*, 2018 WL 259208 at *3, ¶ 9 (rejecting father's argument that mother blocked his access to the parties' child by obtaining order of protection in part because father "essentially made no effort to modify the protective orders to obtain visits with [child]").

¶19 Admittedly, Mother did not facilitate Father's phone contact with the children. She acknowledged at trial that she did not accept all of his calls from jail because "[h]e wasn't very nice to [her]" when they spoke. When asked if she affirmatively blocked his phone number while he was in jail, Mother conceded that she might have. And after Father was sentenced to prison, Mother never applied to the Arizona Department of Corrections to be an "approved contact" so that Father would be permitted to call her phone to speak to the children from prison. Mother's failure to facilitate Father's phone contact with the children during his incarceration was not wrongful, however, because her actions were consistent with the decree, which denied Father parenting time until he took steps to address his mental health and substance abuse issues.

¶20 Moreover, Father's attempts to blame Mother for his failure to maintain a relationship with the children overlooks the principle that a "parent must act persistently" to foster and maintain the parent-child

relationship despite obstacles that may arise. *See Michael J.*, 196 Ariz. at 250, ¶ 22. Even if Mother could be said to have interfered with Father's relationship with the children, he nonetheless had an obligation to act persistently to maintain his relationship with them. *See id.*; *see also Steven M. v. Dep't of Child Safety*, 254 Ariz. 426, 430, ¶ 12 (App. 2023) ("When a parent cannot exercise traditional methods to bond with the children, he must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary.") (cleaned up). The record shows that Father made no such efforts. Although Father told a social worker before trial that he sent the children letters and photos while incarcerated, at trial he admitted that he did not. While Father attempted to excuse his failure to write letters to the children by testifying that he "had no way of doing so while [he] was in custody," the court was not required to credit this rather flimsy excuse. An incarcerated inmate can still send letters by mail, as Father himself demonstrated when he mailed harassing letters from jail to Mother and her employer.

**¶21** The record also supports the court's determination that Father "has provided minimal or no financial support" for the children. Mother testified that Father never paid any child support. Father testified that he paid Mother $30 on one occasion and that, on another occasion, he gave $500 to his mother, Terri R., to pass along to Mother for the children's support. Terri R., however, denied that her son ever gave her money to provide to Mother for child support. Even crediting Father's testimony, the amount of child support he claims to have paid in the two and a half years since entry of the February 2020 decree is a mere fraction of the $387-per-month that he was ordered to pay.

**¶22** In short, Father could have maintained his relationship with the children in a variety of ways, but wholly failed to do so. His failure to "act persistently" to maintain his relationship with the children, *see Steven M.*, 254 Ariz. at 430, ¶ 12, supports the court's finding of abandonment.

### B. Best Interests

**¶23** "[S]tanding alone," a finding of abandonment "does not permit termination of parental rights." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 4 (1990). Instead, the court must also find termination would be in the child's best interests. A.R.S. § 8-533(B). Father challenges the court's "best interests" determination, arguing that his "relationship with the children" could be "further nurtured and developed if he maintains his parental rights."

¶24 Termination may be in a child's best interests if either "the child would benefit from a severance *or* be harmed by the continuation of the relationship." *JS-500274*, 167 Ariz. at 5. In determining whether the child will benefit from termination, a court must consider "the totality of the circumstances existing at the time of the severance determination," *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018), including whether the "current placement meets the child's needs," whether the child is adoptable, and whether an adoption plan is in place, *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3-4, ¶ 12 (2016). Other relevant considerations include the child's "interest in stability and security," *id.* at 4, ¶ 15 (citation omitted), and the parent's "rehabilitation efforts," *Alma S.*, 245 Ariz. at 151, ¶ 15.

¶25 The undisputed evidence shows that the children's needs are being met in Mother's care. Moreover, Mother testified that termination would be in the children's best interest because Father is "very unstable" and his "unsafe behavior" poses a risk to the children. He has "been in and out" of "rehabs" and jail "multiple times," she stated, and experiences "hallucinations and delusions" when using illegal drugs. Her testimony on this point was corroborated by Father's mother, who admitted at trial that Father "gets paranoid" when he "does drugs."

¶26 Father's argument that the juvenile court failed to "consider the degree to which" he could "further nurture[] and develop[]" his relationship with the children overlooks the fact that, at present, he has no relationship with them at all. When Father left the marital residence in March 2019, the older child was three and the younger was eighteen months old. They have not seen Father since and have only spoken to him by phone "a handful of times." Social worker Gail Olson, who conducted a social study of the family, testified that C.R. and A.R. "do not really know their father and there is no bond between them." Olson further warned that reintroducing Father into their lives would be "traumatic" for them. This evidence is more than enough to support the court's finding that termination would be in the children's best interest. *See Steven M.*, 254 Ariz. at 431, ¶ 16 (holding that testimony "that termination would provide the children with a sense of stability and safety," that the children's placement was "meeting their needs," that "the children did not think of Father as their father," and that "forcing contact . . . could traumatize the children," taken together, "supports the juvenile court's best interests finding").

¶27 Father has made no sustained effort to confront and address his mental health and substance abuse issues. Indeed, at times he has denied that those issues even exist. Although he admitted during the dissolution proceedings that he has a "Seriously Mentally Ill" diagnosis, he

denied it at the termination trial, insisting instead, "I have anxiety disorders and that's it." Likewise, although Father testified at the termination trial that he completed an "intensive addiction treatment" program in June 2022, he simultaneously denied having "any drug problem." He acknowledged participating in "several" residential drug treatment programs over the last few years, but claimed that he did so only because he was "homeless." He entered "rehab," he explained, "just to seek shelter because it's hot in Arizona."

¶28 Although, as Father correctly asserts, "[n]o evidence was presented" that "an adoptive parent" was "waiting to adopt the children if Father's parental rights were terminated," a prospective adoption need not be shown to establish that a child would benefit from termination. And Father's assertion in his opening brief that even "a bad parent is better than no parent" at all presents a false choice. The issue here is not whether C.R. and A.R. would be better off with a bad parent or none at all, but whether the children, who are well cared-for by a loving and capable parent, are better off having a second parent in their lives who is erratic, unstable, and has failed to effectively address longstanding substance abuse and mental health issues. The record supports the juvenile court's determination that, "given Father's lack of sincere efforts to truly seek help and rehabilitation," termination would benefit the children "in terms of security and stability" in that "Mother would be able to . . . parent them without having to take into account Father's erratic behavior." As the court correctly observed, the "law does not require [the children] to wait forever until Father demonstrates sincere efforts to get and accept the help he needs to engage in a true parenting role." *See Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 17 (App. 2016) ("[C]hildren should not be forced to wait for their parent to grow up.") (citation omitted). Father has shown no error in the court's finding that termination is in the best interests of C.R. and A.R.

**CONCLUSION**

¶29 For the foregoing reasons, we affirm.

