NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO K.D.

No. 1 CA-JV 25-0006

FILED 10-02-2025

Appeal from the Superior Court in Maricopa County
No. JS22371
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

COUNSEL

Law Office of H. Clark Jones, LLC, Mesa
By H. Clark Jones
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Marika J. Hodge
*Counsel for Appellee Arizona Department of Child Safety*

---

## MEMORANDUM DECISION

Presiding Judge D. Steven Williams delivered the Court's decision, in which Judge Andrew M. Jacobs and Judge Michael S. Catlett joined.

---

**W I L L I A M S**, Judge:

¶1        Mother appeals from the juvenile court's order terminating her parental rights. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2        Child was born in 2014. While pregnant, and again shortly after child's birth, mother tested positive for various illegal drugs. The Department of Child Safety ("DCS") petitioned the juvenile court for a dependency finding, alleging mother's inability to parent due to substance-abuse and mental-health concerns. The court found child dependent, but dismissed the dependency at DCS's request after mother completed drug treatment.

¶3        Within months, DCS again petitioned the juvenile court for a dependency finding after mother was seen "visibly impaired" while pushing child in a stroller. Mother tested positive for multiple illegal drugs, which were also found in her home. Again, the court found child dependent and ordered her removed from mother's care, but dismissed the dependency a year-and-a-half later at DCS's request after mother completed more drug treatment.

¶4        In 2022, father died at home from a drug overdose. Mother was home at the time but did not call 911 for several hours. She too tested positive for drugs in her system and told police she threw all evidence of drugs in the dryer. Police found between fifty and one hundred syringes (some used and some unused) in the dryer, as well as other drug paraphernalia in the home. Later, DCS interviewed child (then eight years old), who described with accuracy the type of syringes found in the home for drug usage. DCS also reported "the apartment was not in good living condition[]," there was nowhere for child to sleep, and "it was difficult to navigate due to all the items on the floor." Though mother admitted to DCS she had a drug problem since age sixteen, she "declined" help for her substance abuse, claiming she only needed "counseling."

**¶5**         DCS removed child from mother's care for a third time, placed her with paternal grandparents, and again petitioned the juvenile court for a dependency finding. The court again found child dependent.

**¶6**         Over the next year-and-a-half, to her credit, mother participated in many DCS-offered services, including undergoing a psychological evaluation. But the evaluator felt mother minimized the issues that led to DCS involvement and presented "attitudes [that] are likely barriers to treatment," including reporting that therapy services were "useless." The evaluator recommended mother complete eighteen months of outpatient treatment and drug testing "with no missed, positive or diluted drug screens." Mother resisted drug treatment but did participate in drug testing.

**¶7**         Initially, mother refused substance-abuse treatment because she did not like the group therapy it included. Instead, she attended individual counseling at a methadone clinic she had already been attending, and later at another methadone clinic. Mother's provider from the second methadone clinic later testified mother met with her regularly and made therapeutic progress. But the provider also said there were issues she was unable to address because she was not a licensed provider, mother did not disclose all of her substance-abuse history, and mother's substance abuse issues required more than just methadone treatment.

**¶8**         At the end of 2023, mother completed an intake with the substance abuse treatment program DCS had initially recommended. The program recommended standard outpatient treatment, but mother refused, and the program changed its recommendation to an eight-hour substance-abuse class based on mother's self-reporting. DCS attempted to reassess mother for services, but she refused. By May 2024, mother completed one eight-hour course and group therapy sessions through the program. And though she had several clean drug tests, between March and May 2024, mother had diluted test screens and tested positive for alcohol after being told she must abstain from drinking. Mother responded by stating that consuming alcohol to manage her anxiety is not a concern.

**¶9**         As for therapy, mother's therapist later testified that though mother met with him regularly, she did not delve into the root of her substance-abuse issues and that he had to redirect her from discussing her issues with grandparents back toward her therapeutic goals.

**¶10**         In late 2023, visits between mother and child changed from supervised to unsupervised. But after just a few months, the child's

therapist wrote to the juvenile court expressing "deep[] concern" and recommending that visits be suspended or modified because the child "exhibited signs of emotional dysregulation and behavioral regression following [] overnight stays" with mother. For her part, child reported that mother "talks bad" about grandparents during visits. After the court ordered visits reverted to supervised, things improved with child. DCS reported that there had been "no negative talk about family" during the visits, there had been "a difference in [child]'s behavior since returning to supervised visits," and child was "engaging more with her grandfather."

¶11        In June 2024, grandparents petitioned to terminate mother's parental rights (which DCS ultimately supported) alleging two statutory grounds justifying termination—(1) fifteen months in an out-of-home placement and (2) Mother's substance abuse—and that termination was in child's best interests.

¶12        At the November 2024 termination adjudication hearing, grandparents presented evidence as outlined, *supra* ¶¶ 2-10. For her part, mother testified she was sober (with the exception of her positive alcohol tests), did not consider herself to be in active addiction, and was committed to sobriety. She also testified therapy had not been useful to her and that she had not addressed with her therapist the issues underlying her addiction.

¶13        The juvenile court terminated Mother's parental rights based upon both alleged statutory grounds and in child's best interests. The court acknowledged mother's participation in services but ultimately concluded Mother had not fully engaged in treatment such that any substance-abuse related parenting concerns were eradicated.

¶14        Mother timely appealed. We have jurisdiction under Article 6, Section 9 of the Arizona Constitution, A.R.S. §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1), and the Arizona Rules of Procedure for the Juvenile Court 601(a).

## DISCUSSION

¶15        Mother contends there was insufficient evidence to support either statutory ground the juvenile court found justifying termination of her parental rights, or that termination was in child's best interests.

¶16        To terminate parental rights, a court must find at least one statutory ground enumerated in A.R.S. § 8-533(B) by clear and convincing evidence, *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000),

and that termination is in the child's best interests by a preponderance of the evidence, *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). On appeal, we "look only to determine if there is evidence to sustain the [juvenile] court's ruling" and do not reweigh the evidence. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). We will affirm "unless the juvenile court abuses its discretion or the court's findings are not supported by reasonable evidence." *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 14 (2022).

## I. Clear and Convincing Evidence Supports the Out-of-Home Placement Ground

**¶17** To terminate parental rights based upon fifteen months in an out-of-home placement requires clear and convincing evidence that: (1) the child has been in out-of-home placement for fifteen months, (2) DCS has "made a diligent effort to provide appropriate reunification services," (3) "the parent has been unable to remedy the circumstances that cause[d] the child to be in out-of-home placement," and (4) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c).

**¶18** Mother does not dispute the child has been in out-of-home placement for fifteen months or that DCS provided adequate reunification services. Rather, she argues she remedied the circumstances that caused the out-of-home placement by the time of the termination adjudication hearing and there was no evidence that the circumstances would continue in the future.

**¶19** Child's out-of-home placement was caused by mother's substance abuse. And there is record evidence to support Mother's position she made progress towards sobriety, including several clean drug tests, her participation in group therapy and individual counseling, and her participation in other services offered. But there is also record evidence to support the juvenile court's finding that a "significant challenge with [mother's] participation in services has been her lack of honesty regarding her substance use and her need for [] treatment." Indeed, mother has a history of relapsing, showed a lack of understanding of the gravity of her substance abuse, and maintained an attitude that therapy was "useless" and any substance-abuse treatment unneeded.

**¶20** Moreover, mother's therapist testified mother was not getting to the root of her substance-abuse issues and had not yet demonstrated a

complete understanding of how those issues affected her parenting. And while mother contends she would have been able to address the root of her substance abuse issues if given more time in therapy (something her therapist opined), the juvenile court heard this testimony and weighed it with mother's history of relapse and general attitude towards her substance abuse and treatment for it. Mother's argument effectively asks us to reweigh the evidence, which we cannot do. *Mary Lou C.*, 207 Ariz. at 47, ¶ 8.

**¶21** Because record evidence supports the juvenile court's finding that mother had not remedied her substance-abuse issues and that there was a substantial likelihood she would be incapable of exercising proper and effective parental care and control in the near future, A.R.S. § 8-533(B)(8)(c), mother has failed to show error. Because only one statutory ground is required to terminate parental rights, we need not address mother's argument regarding the substance-abuse ground. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

## II. Reasonable Evidence Supports the Best-Interests Finding

**¶22** Mother also argues the juvenile court's best-interests finding is not supported by reasonable evidence.

**¶23** The termination of parental rights is in a child's best interests if the child would either "benefit from a severance *or* be harmed by the continuation of the [parent-child] relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). "[C]ourts must consider the totality of the circumstances existing at the time of the severance determination." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018). On appeal, we will affirm the juvenile court's best-interests finding "if reasonable evidence and inferences support [it.]" *Id.* at 151, ¶ 18.

**¶24** The juvenile court found that child "would be harmed by the continuation of the existing parental relationship because the child would linger in foster care, uncertain about her stability and future, while [mother] continues her prolonged journey toward sobriety." Further, child "is caught between the emotional division between [grandparents] and [mother]." A review of the record supports the court's findings.

**¶25** Child had been removed from mother's care two times before this case arose and had been out-of-home for a year-and-a-half by the time of the termination adjudication hearing. Further, when mother's visitation changed from supervised visits to unsupervised, child regressed emotionally and behaviorally when spending longer periods of time with

mother (overnight). The tension between mother and grandparents was also detrimental to child's mental and emotional health. And despite the substance-abuse treatment offered to mother, she had not been able to overcome her substance-abuse addictions.

**¶26**   The juvenile court also found that termination of parental rights would benefit child. Record evidence shows that child is adoptable and that grandparents are willing to adopt. *Alma S.*, 245 Ariz. at 150, ¶ 13 ("[A] child's prospective adoption is a benefit that can support a best-interests finding.") (citation omitted). Further still, evidence showed grandparents were providing for child's emotional and physical needs and would continue to do so. For these reasons, mother's arguments against the court's best interests finding fail.

## CONCLUSION

**¶27**   We affirm the termination of mother's parental rights.

